JiiSge Nicholas
delivered the following Opinion of a majority of the Court
from which Judge Underwood dissented.
This is a proceeding in chancery, in behalf of Gass and Bonta, two seceding members of .the religious society called Shakers, resident at Pleasant Hill, in Mercer county, for the purpose of obtaining a division of the property belonging to the society, and having their shares allotted to them, either upon the principle of ^equality, as two of its covenant members, or according to the amount of property .each carried with him into the society.
The following is the substance of the covenant or articles of association of the society, signed by all its members, and which constitute the terms of the trust, upon which all its property is held — •
The preamble recites that it is their faith and invariable practice, that sc all who come into membership, do ’freely and voluntarily dedicate and devote themselves and all they possess to the service of God forever ; and it being-their faith, that the union and relation of the •church, in one joint interest, is a situation the most acceptable to God, and productive of the greatest good of any state or situation attainable on earth,” therefore covenanted and agreed together by these articles :—
First. To gather themselves together, and be constituted and formed in the order of a churctu
Second. Creates an office of trustee, or agentship, and appoints three of the brethren thereto.
Third. New members allowed to come in, and bring and devote to the joint interest of the church, all such *171 property as they justly hold &c.” The joint interest of the church thus formed by the free will offerings of the members, respectively, shall be possessed and held by the whole body jointly, as their natural and religious right: that is, every individual-of or belonging to the church, shall enjoy equal right and privileges in the use of all' things pertaining to the church, according to their order, and as every one has need, without any difference ■ being made on account of what any one brought in.” “ And it shall1 be the duty of alt the members to support- and maintain the joint interest of the church, according to their several' abilities as members, for- the good of the whole.”
Art. 5. The trustees to take and hold the property in perpetual succession — the man-' ner and purposes oftheirholding — their powers and duties.
and relinquish Art. 7. Tim members covenant to give up-all their property to their church, for charitable uses fyc. all claim upon She society, or its members, for property contributed, or services rendered,
Fifth. Makes it the duty of the trustee or agentship, a to take charge of all the property dedicated, devoted and given up, as aforesaid, to the joint interest of the church, or that may thereafter-be given or devoted for the benefit of the church.” “ The said joint interest shall be held by them, in the capacity of agents or trustees, and shall be and remain forever, inviolably under the care and oversight and at the disposal of the trustee or agentship of this church, in a continual line of succession ; that the transactions of the trustees in the use and disposal of the joint interest, shall be for the mutual benefit of the church, and in behalf of the whole body, and to no personal end or purpose whatever. But the trustees shall be at liberty, in union with the body, to make presents and bestow deeds of charity upon such as they may consider the real objects that are without.” In case of a vacancy in the trusteeship, the duties to be transferred and devolve on a successor to. be appointed” — so that each individual appointed to the office of trusteeship, shall be invested with the power and authority of managing and disposing of the property and interest of the church.”
Seventh. “ As the whole end and design of our thus' uniting in church relation, is to receive and diffuse the manifold gifts of God, to the mutual comfort and happiness of each other, as brethren and sisters in the gospel, and for the relief of the poor, the widow and *172 the fatherless, and such as may be deemed real objects of charity ; therefore, we covenant and agrée together, that we will never hereafter make any account of labor or property or services, devoted by us to the purposes aforesaid, or bring any charge of debtor or damage, or hold any demand whatever against the church, or community, or any member thereof, on account either of services, Or of property given, rendered or consecrated to the aforesaid sacred and charitable uses.”
It' is clear, that, because of the 3d article, there can be no division of the effects according to what each member bro’t in ; and equally clear, upon tho whole covenant, that the intent is, that the whole property and labor of each member shall be devoted ta ‘the church,’ os a quasi corporation, for ‘charitable purposes,’ the support of continuing members ífc. forever : — ■ and the question is, whether ^uch a covenant is valid in law.
The third article precludes any claim to a division to be made according to what each brought in ; and the single question is, whether the complainants have such an interest in the property of the society, as entitles them to a partition and equal division with the other members. There is not, nor ean there be, any dispute,, that if they obtain such relief, it must be in direct contravention of their express agreement. Nothing can be plainer than the intent to keep the property together in perpetuity, for society purposes, free from any individual claims on the part of its members. The preamble sets out by declaring; “that all who come into membership do freely and voluntarily devote themselves and all they possess to the service of God forever ;” and that the union and relation of the church, in one joint interest, is a situation the most acceptable” &o. and then covenant, in the first place, “to gather themselves together, and be constituted and formed in the order of a churchthat is, into a society by the name of “ a church.” The principal aim, to be gathered from the preamble and this first clause of the covenant, was to build up a religious society, “ devoted to the service of God,” and, as a means of sustaining the society, that “all free will offerings” should be dedicated to the service of God, by being devoted to the uses of the society. The expectation was, that the society was to remain together, and, through a succession of members, continue forever. It could not answer the purposes of such a society, that the property upon which it was to depend for its subsistence, should be the joint and several estate of its members as natural persons, subject at *173 til! times to reclamation and division. Such a right would be obviously incompatible with the great leading intention of building up and perpetuating the society, and of dedicating the property brought into it, “ to the service of God forever.” If this covenant, then, be construed, as all covenants must be, with an eye to the subject matter about which it was written, it seems to us, there will be little room for doubt or difficulty as to i,ts true construction. The third article, after providing for the admission of new members and their bringing in their property and devoting it to the “joint interest of the church,” provides that the “joint interest of the church thus formed,” shall he “ possessed and and held by the whole body jointly as their natural and religious right.” How as their natural and religious right ? The article proceeds to explain : “ that is, every individual of the church shall enjoy equal rights and privileges in the use of all things pertaining to the church, according to their order, and as every one has Heed.” In other words, every member of the church, that is, of the society, shall use, according to his need, all tilings pertaining to the church, that is, belonging to the society. The import of the whole section being, that the property brought in should become the property of the whole soci ety, as a society, witli a several right of use conferred on each member, as a member, and by consequence, only whilst .or so long as he remained a member. This construction is further fortified by the language used in the fifth section, which directs the trustees “ to take charge of all the property dedicated, devoted and given up, as aforesaid, to the joint interest of the church.” No terms of more significancy, or of less ambiguous import, than those of “ devoted, dedicated and given up to the church,” could have been used to convey the idea of an absolute divestiture of all individual interest in the property, otherwise than as members of the society. When the article proceeds to declare, that the said joint interest shall be held by the agents, as trustees, and so remain forever, in a continual line of- succession ; and when it *174 is expressly agreed, in the seventh article, that none of them “shall ever make any account of labor or property or services, devoted by us, as aforesaid, or bring any charge of debtor or damage,- or hold any demand whatever against the church, on account of services or property, rendered or consecrated to the aforesaid sacred arid charitable uses,” the language used in the third article is entirely cleared of all doubt or ambiguity. — ■ The expression used, that the members were to take the use as thier natural, as well as religious right, is sufficiently explained, by the context of the whole instrument, to mean nothing more than that they were to have such right only as members and whilst they were members of the society. The palpable intent, to be gathered from even the most cursory consideration of the whole instrument, was, to tie. up, for society purposes, the usufruct of the property, and have it transmitted in-perpetual succession, as though the property had been conveyed to a corporation of perdurable existence. The true point presented for consideration, is, whether this intent squares with the rules of lawj or can be effectuated without doing violence to settled principles.
The grounds Opon which the right to have a ¡partition of the property, is asserted.
The claim to partition is asserted ori the ground, that the' beneficial use or proprietorship of the several portions of property belonging to the society, was in such as were covenant members at the dates of their acquisition. That this beneficial use or proprietorship, they necessarily held in their individual, natural, and not their society capacity. Because, not being a corporation, they could not take the use in the latter capacity. That, all the use attempted to be created, except for their individual benefit, is-void for uncertainty, and for the want of cestui que trusts capable of taking such use, arid because such use, if allowed to operate in the manner intended, would create a perpetuity. ‘ That the covenant members, therefore, took the whole estate as cestui'que trusts, by the legal effect of the conveyances and of the terms of the covenant; — or, that it is theirs by way of resulting trust, as the payers of the purchase money, — so much as was intended otherwise than for *175 their individual benefit, being void and inoperative.— And that, being thus the joint, beneficial proprietors of the property, in their individual, natural capacities, the covenants in restraint of partition, and the assertion of a several proprietorship, are repugnant, idle, and merely void.
The English statutes of morí main and of cha ritable and superstitions uses have ever been construed as applying to corporations exclusively. The 23 of H. VIII. c. 10, which declares, that certain feofments, made in trust, to the intent to have obits perpetual — thecon tinual services of a priest fyc. shall be void, have never, to this day, been held to invalidate trusts made for charitable §• useful purposes not deemed superstitious. 1
In the argument of this case, the attention of counsel was invited to the effect and bearing upon it, of the English statutes of mortmain, of superstitious and of charitable uses ; not that we supposed the case came within the mortmain acts, but that the ground might be thoroughly explored, and that it might be ascertained, if practicable, that it certainly did not. This society of Shakers bears so perfect a resemblance, except in the single particular of not being incorporated, to those religious houses, against alienations to which the mortmain acts were principally levelled, that we wished it to be ascertained, from research, whether that circumstance would except it from the operation of those acts. The result of the investigation has been to prove, that the mortmain acts have always been strictly construed; that they have been confined, exclusively to corporations, and that no other class of cases has ever been held to be embraced by them, as coming within the mischief they were intended to remedy. Even the statute 23 Henry VIII. ch. 10, which sets forth in its preamble, that by reason of feofments made in trust to the use of parish churches, chapels, church-wardens, guilds, fraternities, companies, or brotherhoods, erected or made of devotion, or by common consent of the people, without any corporation, to the use and intent to have obits perpetual, or any continual service of a priest, or to such like uses, intents and purposes, there groweth the same like losses, inconveniences and prejudices, as doth where lands are aliened in mortmain, and renders void all such uses ; even this statute, though passed at a time when obits and priesthood were consistent with the then established religion, was construed not to apply to alienations in trust for good and charitable uses : such as finding a preacher, maintenance of a school, relief of maimed soldiers, sustenance *176 Of poor people, reparation of churches, highways ffic;, or 44 other like charitable uses,” but only to superstitious uses. Porter's case, 1 Co. R. 24. It it there saicl, that almost all the lands then' belonging to the towns and boroughs, not incorporated, were conveyed to several inhabitants of the parish, upon trust and confidence, for such good uses, as defraying taxes, repairing highways and churches, maintaining the poor of the parish &c. &c., and it would be a thing dishonorable to the- law, to make such good uses void, or to restrain men from giving lands thereto. This construction has been followed ever since, and it is too late now even to call it in question, however far it may be supposed to have departed from the original, true intention of the statute.
The use created-by the covenant of the Shakers, is not such as would he held superstitious in England; nor is tiiere any thing illegal, according to the laws of this state, in the uses to which their property is devoted. • [See the views of Judge Underwood, in his Dissent— posf.] Here, where the constitution guaranties freedom and equality to all religions, it it is not competent for the legislature,, or any court, to de nounce a use or trust made for. thebeuefit ofany religious society, as a siuperstitious use
The use created by the trust for this society, would at no time since the reformation, have been deemed a superstitious use in England.’ For though the courts there disallowed trusts in favor of the catholic or jewish religion, as inimical to the established religion and settled policy of the government, yet trusts in favor of dissenting protestants have always been sustained ancl enforced. With much less reason, therefore, could it be denounced here, as a superstitious use, where we have no established religion, and where, by our consti-' tution, all religions are. viewed as equally orthodox. The recognition which religion generally has obtained from common consent and legislative enactments among us, as a valuable portion of the institutions of our society, must prevent the courts from saying that every religious use is a superstitious use, and, by consequence, must compel them, in fulfilment of the spirit of the constitution, to declare every religious usé a pious use. It is neither for the legislature, nor the judiciary, in this state, to discriminate and say, what is a pious, and what a superstitious use. To'do so, would necessarily infringe upon the great constitutional guarantee of a per-s feet freedom and equality in all religions. There is, therefore, nothing illegal in the uses or purposes for which the society intended to devote its property, as $ religious community ; and the only question is, whe* *177 iher it has been sufficiently secured, to the exclusive purposes of the society, as a religious community, freed from the claims of its seceding members.
The statute 43 Elis:, of charitable uses, is in force in this state ; and consequently, tho’ there were a defect or want of cestui que trust to take the use or if the use were of a character toe indefinite 4' uncertain to be enforced independent of the stat*. ute, the trust would not there fore be void— as the chancellor could obviate those difficulties;
Notwithstanding the attention of counsel had been invited to the question, whether the statute 43d of Elizabeth, of charitable uses, was in force here, it was not contended, on the argument, that it was not. Our own reflections have not led to any plausible suggestion, why' it should not be considered as in force. It has never been repealed, nor is there any thing in it of so peculiar and local a character, as to exclude it from adoption, under the rule embracing all English statutes of a general character, prior to 4th James I. It is treated as in force, and has been acted on, in several of the other states.
The establishing of the fact, that it is still in force, relieves us from the necessity of investigating the very vexed question, as to the true extent of chancery power and jurisdiction over charitable uses, independent of that statute. It also relieves us from an. investigation of the question, whether, according to the principles of the common law, there is here a defect or want of cestui que trusts, to take the use according to the apparent intent of the covenant of association ; or whether the uses themselves are of too indefinite and uncertain a character to be enforced, independent of that statute. For, according to a construction of two hundred years, and which has been acted on m numberless cases, under that statute, neither of those circumstances will invalidate the trust, provided it be a charitable use. Where the objects of the charity, and the mode of its application, are pointed out, but not with sufficient distinctness or certainty to be specifically and accurately enfor-' ced, the court will, under its cy pres doctrine, give it effect, as near the general intent as may be ; and even where there is no specific mode or object pointed out, and in some cases where the object fails or ceases to exist, the court will, in respect of the general charitable purpose, devise a mode itself for giving it effect and employing the charitable funds ; supply an original. *178 want of trustees, or, if necessary, displace old, and create new ones. See a digest of the cases, and a summary of the law upon this subject, in an appendix to 4 Wheaton. Also, 3 Peters, 481, and in the case of Moggridge vs. Thackwell, 7 Ves. 35.
Tile chief enquiry, in this case, is whether the trust fyc. created by the Shakers’ “ covenant,” is for a charitable Mse.
Where a 'conveyance is made of property to be held in trust, it is not the less for a charitable use, because the founders or contributors to the fund reserve to themselves the right of partaking of the benefits of the charity, nor because they are members of the society for whose use and benefit the property is field.
The principal, if not the only question, for our determination, is, therefore, whether this be a charitable use, such as a court of chancery would support and enforce under the 43d of Elizabeth. For if it be, it will -conclusively shew, that the court ought not to assist any •one in breaking up and dividing out the charitable fund ; and if it be not, it will go far to sustain the argument, which insists upon a right of partition among the founders of the fund, from the want of capacity, any where, to enforce the trust, according to the intent-ion of its creators.
The idea of this being a charitable use, is met at the threshold, by the statement, that this trust was created for the individual benefit of the members of the society, who themselves created it, and by the assumption of the broad proposition that, that can never be a charitable use which a man creates for his own benefit. It cannot be denied, that, on becoming members, each secured to himself a maintenance during life, and so far secured or reserved a personal benefit. But it does not necessarily follow, that it is not, therefore, a charitable use. It cannot be an objection to the designation of funds or property, for charitable purposes, that the founder secures to himself, with the rest of the community, a right of partaking the benefits of the charity. If the general objects be charitable, his participation in them, on the same footing with others, cannot render them the less so. The granting of property absolutely to the society, with a reservation of the right to participate in the benefits of the whole property of the society during membership, may, or may not, be beneficial to the donor, in a pecuniary or worldly view, according to the amount donated, and the ability of the donor otherwise to provide for himself. If it be conceded, that property given by a stranger, to the use of the society, would be a charitable use, it will be impossible *179 to discriminate a sufficient distinction between such a gift, and that from a person, or number of persons, who give their property at the time of becoming members. If the society be really charitable in its ends and objects, it cannot he any the less so because its founders, or the most of them, are its members also. The donation is not to each other, in the nature of a community of goods among individuals, but to the society. They do not hold as individuals, but as members of the society.. Their proprietorship of the usufruct continues so long only, as.they continue members. When they cease to-he members, they cease to be proprietors. If a masonic lodge be supposed to be a charity, it will furnish the means of a fit illustration on this subject. Suppose some of the members of a lodge, the expenses of which-are defrayed at the joint cost of all the members, were, by joint contribution, to appropriate a fund, or to purchase property in the names of trustees,, in trust for the use of the lodge, and the defraying its expenses forever. Or suppose the individuals composing the congregation of any particular church, in order to save themselves- and those who shall succeed them the expense of an annual contribution for the support of the pastor and repairing the church, unite in creating a permanent fund or in purchasing property in the names of trustees, to be held in trust for the perpetual use and benefit of the church, in the defraying those expenses. In both of these cases, the trust would be for the easement of those who created it, and, pro tanto, they would reap individual benefit from it. Yet it would not be contended* that the fund so created, or the property so bought, was not devoted to a charitable use. The amount of interest thus reserved for the individual benefit of the donors, cannot constitute any difference in the principle which must be the test whether it be a charity or not.
The duuse in-permits the trus tees, with the assent of the society, to make donations to strangers' — permissive merely, and indefinite ás to amount — is entitled to no influence upon the question whether the trust is for a chaita-.- >)] e use.
As was justly remarked at the bar, no stress can be laid on the clause of the covenant giving the trustees power to make charitable donations to strangers, with *180 the assent of the society, because the clause is permissive merely and not directory, and because if it were mandatory, it is so totally indefinite as to amount, that it could not be judicially enforced or carried into effect. Such a clause can weigh nothing, in determining the question, whether it be d charitable use or not.
The poor tfc. though not expressly provided for, are not excluded from the.benefits of the charity.
The objects and purposes of the society and association called Shakers considered — andde termination that those objects tf purposes are such as must, in this state and under our constitntion#law«, be deemed charitable and pious ; and that the trust If úse created by ‘the covenant,’ or articles of agree jnent among the members, are valid in law.— [See the views of Judge Underwood, in his dissent — yi ast.]
It is again objected, that this is no provision for the poor, the maimed, or the decrepid. True it is not in an exclusive degree. But persons of that class may become members, and derive the full benefit of the institution. There is nothing in its ordinances to exclude them. They require nothing, so far as we can ascertain, but the proper religious faith.
• The main purpose of the institution appears to be, to enable a number of persons, of both sexes, to live together, in celibacy, as one community, for the freer and better exercise of their peculiar religious tenets. It bears a strong, if not perfect, resemblance to the convents and nunneries of the catholic faith. If we suppose the reformation never to have taken place, and that the catholic religion had still remained as the established religion, until and after the passage of the 43d of Elizabeth, it could not be doubted, that a fund devoted to the establishment or support of a nunnery or convent, would have been held to be a charitable use, on the same principle that the erection of a chuch, the education of ministers, the support of a parson, and such like, are now so esteemed by the English courts. If a fund were now devoted, in this state, to the erection and support of a nunnery or convent, could we say it was a superstitious use, or that it was not a charitable use? If not, then we cannot discriminate; we are equally bound to say, that a fund devoted to the sustenance of a society of Shakers, is equally a charitable use.
So long as piety is recognised, by common assent, and by the legislature, as a valuable constituent in the character of our citizens, the general law must foster and encourage what tends to promote it. In legal estimation, it must be viewed, as what is not only estimable in itself, but as an appurtenance to the characters of individual citizens, of great value to society, for its ten *181 dency to promote the general weal of the whole community. By the common assent of men in all time, it seems to be agreed, that societies or communities of individuals, having its cultivation for their principal object, are necessary, or at least proper, auxiliaries to its support and propagation. In a country like ours, where it is one of the fundamental canons of the political law, that there shall be no established religion, and that government shall not actively participate in the support or dissemination of religion of any sort, all such societies — pious institutions of ail sorts, must depend upon thé eleemosynary contributions of individuals. This would seem to require, that the law should esteem such contributions' as in a peculiar degree charitable. Whenever the end is truly pious, donations to promote it, the law must esteem as really charitable. We need not adopt, and repeat the high encomium, passed by their own counsel, on the lives and character of this peculiar people ; it is sufficient to state, that the learned counsel of the Other side admitted them, in argument, to be a people of the most exemplary piety, industry and peaceableness. If such be the fruit, how can we do otherwise than deem well of the tree? how can we say that which is devoted to the growth and sustenlation of the tree, is not devoted to a truly pious end ?
In De Pas vs. Da Costa, Ambl. 228, Lord Flardwicke recognised the devise of a fund for the establishment of a jesuba, for instructing people in the Jewish religion, as a charitable bequest ; and though it could not be allowed to take effect in the manner intended, because it was to promote what was contrary to the established religion, yet, being a charitable bequest, it should be appropriated to legitimate objects of charity.
In Waller vs. Childs, Ambl. 524, there was a bequest for the augmentation of the charitable collections, which should thereafter be made for the benefit of poor dissenting ministers of the gospel, living in any of the counties of England; which was established as a charitable bequest, and directed to be paid over to the managers of the funds of three societies, for the support of poor *182 dissenting presbyterian, independent, and baptist minjgters.
®° a*s0 ^ IS said, 6 Comyn's Dig. 469, that a gift for the maintenance of a chaplain or priest for divine ser- ^ • yice, is a ciiaritable use, and under the direction of chancery.
In Baptist Association vs. Hart’s Executor, 4 Wheaton, 1, there was a devise to the Baptist Association, that for ordinary meets at Philadelphia, as a perpetual fund for the education of youths for the baptist ministry, and it was held, that the association, not being incorporated, could not take the trust as a society ; that' it could not be taken by the individuals composing the society ; that it was a charity ; that it could not be established by a court of equity, because no legal interest had vested in any trustee by the bequest, and because the bequest was too vague to be claimed by those for whom the beneficial interest was intended — the statute 43d of Elizabeth having been repealed in Virginia- before testator’s death; but, it is distinctly held, that, if that statute had been in force, the charity could and would have been established, and that such a legacy would be sustained in England.
In Beatty et als. vs. Kurtz et als. 2 Peters, a lot of ground in the original plan of an addition to Georgetown, had been marked, “ for the Lutheran church,” and for a number of years had been used by the German Lutherans of the place. This was treated as a dedication of the lot to pious,uses and religions puposes, and though the German Lutherans were not incorporated, and there were no trustees to hold the property, yet it was declared to be such an appointment to charitable uses, as would always have been upheld and enforced by a court of chancery, in England, under the statute 43d of Elizlabeth.
These authorities establish, beyond cavil, that a pious use is considered and treated by the law, as a charitable: use, both in this country and in England. As the general, undeniable, objects of the Shaker association are pious, according to the tenets of their particular reli *183 gious faith, the funds that have been devoted to the purposes of the society, must be held to be an appropriation of them to charitable uses.
The trust estab lished by the Shakers’ ‘cove nant,’ is not void as being a perpetuity; for where a trust is for a charitable use, its being a perpetuity is n« objection to it,'
‘The covenant’of the Shakers is not a covenant in restraint of the freedom of religious faith
This does away all necessity for enquiring more minutely into the character of the association, to ascertain whether it might not properly be classed among those of the charitable order, upon other and distinct grounds. It also obviously renders it wholly useless to go into the • question, principally debated at the bar, whether the trust was void, by reason of its repugnancy to those general principles of law, which inhibit the creation of perpetuities. For when the trust is established to be a charitable use, it is no objection whatever to it, that it is a perpetuity also. The statute 43d of Elizabeth has always been held a pro tanto revocation of the prior statutes of mortmaim ; and though a corporation, according to the principles of the common law, could not be seized to a use, yet the courts have gone so far in support of charities, since the 43d of Elizabeth, as to maintain devises to corporations in trust for charitable uses.
It is also objected to the the validity of this trust, that it is a covenant in restraint of the freedom of religious faith ; that the members of the society are constrained to a continuance in this particular faith, for fear of a forfeiture of their interest in the joint property.— But this idea proceeds upon a total misconstruction of the terms of the trust. As has been before shewn, the trust neither secures nor confers any interest in the property of the society, upon its members as natural persons. They partake of its benefits only by virtue of membership. The donating of property to the society is one thing ; the becoming a member is another. Property may be donated without the donor becoming a member; and membership may be acquired without donation of property. It may be, that continuance in the faith is Becessary to a continuance of membership ; but the change of faith divests no individual interest in the property of the society, for the members hold no interest in the property, in their individual, natural capacity, to be divested. But eyen if the terms .of trust *184 did carry an individual interest in the property, determinable on a change of faith, we do not well perceive how that could be made out a trust in restraint of the freedom of religious belief. Whilst it is optional witlj the cestui que-trust to accept the benefit of the trust or not, it cannot be said that he is restrained of this freedom, because, upon a change of faith, the estate or interest expires by the very terms of its limitation in the instrument creating it. No such exception could be taken to- the validity of the trust in the perfectly analogous case of a conveyance from A to B, in trust for C, so long as C remains a member of a particular religious congregation, and upon his ceasing to be a mem-, her, then in trust for the benefit of the balance of the congregation. Such a trust or covenant requires the performance of nothing from him, upon his change of faith, or ceasing to be a member of the congregation ; it is the mere expiration of an estate according to the terms of its limitation.
The act of 1814 (2 Dig. 1057,) which, authorizing trustees to hold the land on which associations of Christians erect their houses of worship ,-limitB the quantity they may thus hold, to four acres— does not prohibit any religious society from acquiring holding property in other modes,independent of the act.
It is further objected to the validity of this trust, that it is repugnant to the general policy of our law, with regard t.o religious societies, as indicated by the act of 1814, 2 Dig. 1057; which, in authorizing them to hold their churches and adjacent ground, through the intervention of a succession of trustees, limits the quantity so to be. acquired and held, to four acres. But it will be found, on reference to the act, that it contains no language which can be construed as at all restrictive of the general capacity of religious societies to acquire and hold property in other modes than that pointed out by the act. It only restrains the application of the benefit of its own provisions, to an acquisition not exceeding four acres.
We are fully aware of the objections on the score of general policy, that might be urged to the latitudinous recognition here made, of the right of religious societies to acquire property for religious purposes. But the corrective lies not with us. Whenever society shall feel such right as an evil, or it is perceived that'it is about, to becpme an evil to the state, a legislative cor *185 rective will, no doubt, be applied similar to that of the mortmain act of Dth George II.
Shakers seceding and withdrawing,cannot compel the society to distribute, or allow to them, any portion of the common property.
DISSENT' by Judge Underwood — who is of opinion, that the statute 43d Elizabeth, does not embrace the ‘ covenant’ of the Shakers, Sf the trust and uses thereby created ; that their property is not, in fact, devoted to charitable uses, within the meaning of that statute. That if the covenant be construed as an agreement to forfeit the estate of the covenantor, upon his changing his --’’-¡on.itis an agreement without consideration ; contrary to the spirit of the constitution, and void.._ That the effect of the covenant, so far as relates to the property of the society, is merely to constitute a general partnership, for an unlimited time, — connected with an agreement, that the property shall be preserved and increased by the industry and care of the members, so long as they respectively live, and the share of each, upon his death, pass to the survivors. That this is a partnership from which any member may, at will, withdraw, without relinquishing his interest in the joint property ; and that a member may, at any time, declare the partnership, as to himself, dissolved, and demand his due share of the joint effects : which declaration and demand, should be sanctioned and sustained by the chancellor, and decreed accordingly — without further interference, however, with the rights or interests of those who may choose to remain in the society and continue the partnership in the common property.
The result is, that, considering the objects and purposes of the trust under which the property of the Shaker society is held, as legitimate and valid, and that the complainants never had any interest therein by the terms of the trust, except as members and so long at? they remained members, they have no right to the partition which they claim, and, consequently, their cross bill was properly dismissed.
Decree affirmed, with costs.
Judge Underwood dissenting.