Fbeemait, J.,
delivered the opinion of the Court.
This bill is filed by the executors of William E. Kennedy for a construction of certain clauses of his will, and for the direction of the Court of Chancery as to the performance of their duties in the execution of the trusts of the will.
It appears from the record that the testator died on the 17th of December, 1863, in the county of Maury, at an advanced age, having before this time emancipated the larger portion of his slaves, sending them to Liberia, through the agency of the American Colonization Society. He left no children. He disposed of a considerable share of his estate to his col *688 lateral relatives, by various clauses of his will. First, directing, by item second, “that all his estate, both real and personal, not otherwise disposed of, wherever situated, be sold by his executors, and converted into money,” he proceeds, in the ninth and tenth clauses, as follows:
“All the residuum of my estate, of whatever kind, whether real, personal, or mixed, left after carrying out the foregoing provisions of this will (and if any legacy I have given, or fund appropriated in this will, can not for any cause whatever take effect, or be appropriated as herein directed, the same shall constitute a part of said residuum, and be subject to the dispositions of this clause), I give, to my executors to be appropriated by them as follows: one thousand dollars to the proper authorities of the Union Theological Seminary at Prince Edward Court House, Virginia; one thousand dollars to the Rev. W. McLane and the Rev. R. R. Gurley, Secretaries of the American Colonization Society in Washington City, D. C., and their successors, to be by them held and used in promoting the objects, purposes, and enterprises of said society in colonizing negroes in Liberia, Africa; five hundred dollars to the General Assembly of the Presbyterian Church in the Confederate States of America, or of the General Assembly of the .Presbyterian Church, South, whatever may be its precise title, for the benefit of such Bible Society as has been,- or may be, established by said General Assembly; and five hundred dollars to said General Assembly for the benefit of such tract society as has been, or may be, *689 established by said Assembly; and if no suoh society should be established by said Church, or be in existence under its control, then said sums severally to be used by said General Assembly of the Presbyterian Church in the Confederate States of America for the promotion and advancement of the bible and tract cause respectively in such manner as to said Assembly may seem best for the advancement of said objects. I then desire two-thirds of the remainder of the residuum to go to said General Assembly of the Presbyterian Church in the Confederate States of America for the benefit of Domestic Missions, and to be used by said Assembly through its proper board or committee already, .or to be, appointed, or such agency as it may deem best for the promotion and advancement of the cause of Domestic Missions. One-half of the remaining third of said balance to go to said General Assembly of the Presbyterian Church in the Confederate States of America to be by said Assembly appropriated through its boards, committees, or other agency under its control, to the uses, purposes, and benefits of Foreign Missions; the remaining half of said third to go, in like manner, to the said General Assembly of the Presbyterian Church in the Confederate States of America for the benefit of the Board of Education and Publication in equal proportions; and if said Church should have no such boards or committees for these objects, then through such agencies as such Church may establish and control to carry out and promote such objects. When I use the term General Assembly of the Presbyterian Church in the *690 Confederate States of America, or General Assembly of the Presbyterian Church, South, I mean to be understood as referring to the 'Old School Presbyterian Church in the Southand should any part thereof reunite with the Northern Church, I mean the part which shall remain as a separate body in the South.
“I desire said General Assembly, through its proper boards, committees, or agencies in its dispositions of the funds herein set apart to Domestic Missions, to select in one of the four tribes of Indians — viz., the Choctaw, Chickasaw, Cherokee, or Creek — four male and four female youths, and to appropriate of said funds the sum of one thousand dollars for the education of said Indian youths.
“Item 10. In the event that any of the legacies or sums directed to be given to any of the benevolent objects specified in the 9th item of this will should fail on account of a want of proper description, or for any other reason, then I give the same to my executors with the hope and belief that, as they know the objects and purposes I have in view in making these bequests, they will carry them out in such manner as will approximate as nearly as possible to my wishes herein expressed. I here declare it to be my wish and desire that I should not be considered as dying intestate as to any part of my estate. What I have already done for, and given to, my relatives, together with the bequests in this will, is as much of my estate as I wish them to have; and should it so happen that any portion of what I have given to charitable and benevolent objects *691 and societies in this will should fail, or not vest as I have herein desired and directed, 1 do not intend the same, or any part thereof, to go to my kindred, or any of them, but to my executors to be paid over to such charities as may be declared valid and legal in the proportion herein set forth; and if all such charitable bequests should be declared illegal and void so as not to vest, then the whole to my executors in their own right, trusting, nevertheless, and believing that under a proper sense of their obligation to their own consciences and accountability to God, they will as nearly as they possibly can in conformity with what I have herein indicated, pay over and contribute the same to charitable objects and purposes. In other' words, I trust that, should these charities fail as herein set forth, they will do for me when I am dead what I have attempted to do in this my will.”
He then concludes by appointing his friends, the present complainants, and George Lipscomb, the executors of his will — the latter of whom renounced, the other two qualifying and taking upon themselves the duties of its execution.
The defendants, heirs, and distributees, a portion of them answer and claim that these clauses of the will, 9 and 10, are of no validity, because at the date of the will no such corporation was in existence as therein named capable in law or equity of taking the bequests, and because such bequests are in themselves contrary to the policy of the State,- and not to be encouraged.
*692 The others answer and insist that the bequests are illegal and void because of want of capacity in the donees to take, these being, it is claimed, merely voluntary associations not incorporated, and because the charities are not definite in their objects or lawful in their creation, and no trustees are appointed to execute the trusts, and therefore “that the testator died intestate as to this part of his estate, and the same should be distributed by executors under the statute of distributions.”
The Presbyterian Church in the United States answers and claims the bequests, asserting that it was an incorporated body at the time the will was made and took effect, presenting an act of incorporation passed by the Legislature of the State of Tennessee, March 19th, 1862, and accepted by the General Assembly of the Church in August, 1863, incorporating the General Assembly of the Presbyterian Church in the Confederate States of America, which, if valid as the law of the land, and not unconstitutional, confers on the body incorporated the right to take and hold property devised to them. The answer then gives the history of the change of name of the General Assembly of the Presbyterian Church in the Confedérale States to that of the General Assembly of the Presbyterian Church in the United States, showing that the latter is the same body under a different name, and that the latter is the same body as that designated in the will as “Presbyterian Church, South;” and then showing that the executive committees upon the subject of “Domestic Missions, Foreign Missions, Publication and *693 Education/5 were a part of the organization of the General Assembly before its incorporation, and that such agencies have continued substantially to exist till the present time. The answer insists on the validity of the bequests in favor of this Church, and that they be enforced in favor of the Presbyterian Church in the United States as now existent.
We need not give the details as to the date and history of the changes in the name of this body, as we think the main question is, whether the bequests vested in a party capable of taking at the death of the testator. Subsequent changes of name in the corporate body could not defeat the right vested, the body itself remaining substantially the same legal person. 1 Swan, 368.
Assuming for the present that the act of incorporation passed by the Legislature of the State of Ten-nesse was a valid act of incorporation, the question presented is, are the bequests in the 9th item of the will valid charities, under the now well defined rules of law on this subject in this State.
We are relieved from an investigation of the grounds on which this jurisdiction to enforce a charity rests in our State, by the learned and exhaustive opinions of Judge Turley, in case of Green v. Allen, 5 Hum., 177, and Judge Green, in case of Dickson v. Montgomery, 1 Swan, 348, in which this question is discussed with the ability and research characteristic of these able Judges. It may be considered now as settled in this State, and we believe in .most of the States of the Union, that the jurisdiction rests mainly, *694 if not entirely, upon the ordinary powers of our courts of chancery as to the administration and enforcement of trusts, the same character of jurisdiction that is exercised by the Court of Chancery in England, as a part of what is known as its extraordinary jurisdiction, belonging to it simply as a court of equity, and being contradistinguished from its ordinary or common law jurisdiction, and the delegated powers exercised by the Chancellor representing the King as parens patrios, as to a part of the prerogatives of the Crown. See Green v. Allen, 5 Hum., 198; Owen v. Missionary Society of the Methodist Church, 14 N. Y., 387, 388; Beckman v. Bonner, 23 N. Y., 298; Dickson v. Montgomery, 1 Swan, 366.
The principles settled by our decisions are, “that where the charity is definite in its objects, is lawful, and is to be executed and regulated by trustees who are appointed for the purpose, it will be upheld; or in language of the fourth proposition of Judge Green in the case in 1 Swan, p. 367: “ If the fund be vested in a trustee, to be managed and controlled by him, for a lawful, definite and charitable use, the gift will be valid, though there be no person in being capable of suing for the enforcement of the trust.”
This last ease was a bequest to the “ Treasurer of Clarke and Erskine College, and his successors in office, in trust, 1st, for the endowment of the college; 2d, for benefit of Home Missions; 3d, for benefit of Foreign Missions; 4tji, for education of indigent young men preparing for the *695 Gospel ministry in the “ Associate Reformed Church;” and the sums given for the last three objects were to be applied under the direction of the “ Associated Reformed Synod of the South.” These bequests were upheld on the ground that the “ Associate Reformed Synod” was an incorporated body and might “ sue for and recover this fund, to be held by them as their other funds were held, subject to the control of the Synod,” p. 369; and that the bequests for “ Home Missions and Foreign Missions,” were not void as being too indefinite, it being the nature of a charity that its individual beneficiaries are unknown. The gift for such purpose, says Judge Green, is of the nature of a power of appointment, and being controlled by trustees, and .the objects being definite, it is valid. - Applying these principles to the bequests in the 9th item of this will, we hold, that the bequests are valid as gifts to a charity, assuming, as we have done, that the General Assembly of the Presbyterian Church, South, by one name or the other mentioned in the will, was at the time when the will took effect, (that is, at the death of the testator) an incorporated body, capable of taking and holding property. It is given to the General Assembly of the “ Presbyterian Church in the Confederate States of America,” or of the “Presbyterian Church, South, whatever may be its precise title,” for the benefit of such bible society as has been, or may be, organized or established by said General Assembly, and for the benefit of such tract society, as may thereby be established, and if no such societies should be established, or be in existence, *696 then to be applied by the General Assembly, for the promotion and advancement of the bible and tract cause respectively, in such manner as to such Assembly may seem best for the advancement of said objects. Here the party to take, hold and administer the fund is clear, definite and certain. It is the General Assembly of the Presbyterian Church above mentioned. This body or legal person is to take and receive the money from his executors, and is to appropriate and use it for the objects and purposes specified, that is, the promotion of the “ bible and tract cause,” language well understood among and by all who are familiar with the various bodies representing the Christian denominations of our country. The purpose well defined by such language is to aid in printing and circulating bibles and religious tracts among the destitute portions of our population, as may be deemed best and most proper for the dissemination of what is held to be religious truth by the denominations engaged in this department of religious effort. The other trusts in favor of Foreign and Domestic Missions are equally well understood; it being well known, that “Domestic Missions” refers to missionary efforts among the destitute portion of our own country, while “ Foreign Missions” designates that particular department of effort, for the propagation of Christianity, in which the various denominations of Christians have been engaged, especially since about the beginning of the present century, in what are known as foreign lands, and mainly, but not entirely, in heathen countries.
*697 The Chancellor held these charities valid upon the ground that the executors were the trustees. In this view of the case we think he erred, as in the language of Judge Turley in the case of Oreen v, Allen, they are directed to pay 'the fund to the General Assembly of the Presbyterian Church, and have it given them only for that purpose, or rather placed in their hands by the testator, simply charged with the duty of payment to this body; and they have under the ninth clause nothing further to do with the fund, the administration of the charity not being confided to them by this clause, but to the General Assembly of the Presbyterian Church.
We come now to the question whether the act of the General Assembly of the State of Tennessee incorporating the Presbyterian Church is valid, or unconstitutional, or void for any cause whatever.
It is insisted for the distributees that the act of incorporation is void, because passed by the General Assembly of the State assembled at Memphis and not at Nashville, the capital of the State, and because the Legislature was not a legal one.
By s. 2, of the Schedule of the Constitution of 1834, it is provided: “The General Assembly which shall sit after the first apportionment of the representation under the new Constitution, to-wit: in the year one thousand eight hundred and forty-three, shall within the first week after the commencement of the session, designate- and fix the seat of government, and when so fixed it shall not be removed except by con *698 sent of two-thirds of the members of both houses of the General Assembly.”
The Legislature did, in pursuance of this section, declare, as substantially adopted into the Code: “The town of Nashville, in the county of Davidson, is the seat of the State government of this State.” And now it is insisted that if the General Assembly met at any other place while Nashville remained the scat of government, the laws passed by them there are void.
We may say first in reference to the fact that the law was passed at Memphis, that there is nothing on the face of the law from which we can see that it was not passed at Nashville; but assuming, as perhaps ■ we are judicially bound to do, that such was the case, then the question suggested is fairly presented, and we feel bound to decide it. The section of the Schedule quoted only requires the Legislature to designate and fix the seat of government, and that when so fixed it shall not be removed, except by consent of two-thirds of the members of both houses of the General Assembly.
The fair construction of this clause is, that the permanent seat of government shall be fixed; but it certainly does not follow that upon an overriding and controlling emergency, the ’ Legislature, one branch of the government only, may not assemble at another place temporarily, while that emergency lasts, without changing the permanent seat of government.
Again, the presumption which must always stand till removed by clear evidence to the contrary, would *699 be in favor of the regularity of the action of the law-making power in the State; and we would be bound, perhaps, to assume that the change of the place of meeting had been assented to as required by law, and that the seat of • government had been changed by a two-thirds vote of both houses of the General Assembly as required.
On looking into the legislative action of the period, however, we find that in contemplation of such an emergency as did occur, a joint resolution was passed by both houses of the General Assembly, on the 10th of February, 1862, authorizing a temporary change of the seat of government, and authorizing the Governor by proclamation to convene the Legislature, when he deemed it necessary, at the place determined upon as the temporary seat of government. See Acts of the Thirty-fourth General Assembly for 1861 and 1862, pamphlet, p. 82. We might presume, if we did not know it judicially, as part of the public and well known history of the country, that the Legislature did meet in pursuance of this joint resolution.
While in such session the law incorporating the Presbyterian General Assembly was passed.
Another question presents itself in reference to the validity of the law passed by the Legislature of 1862. As a matter of history, we know that the country was then engaged in the late civil war. • Tennessee was one party to the strife, by the action of her people, and was declared to sustain the enemy relation to the United States by the well-known proclamations of the President of the United States, made in pur *700 suance of a law of Congress. By the Schedule to the Amendments to the Constitution of the State, of 1865, it was declared that all laws and ordinances passed from and after the 6th of May, 1861, were null and void, we suppose upon the ground either of the opinions held by the members of the Legislature on the questions between the parties to the Avar, or the fact that the State was then in rebellion against the United States, or perhaps on the theory that; the members of that Legislature were engaged in acts of treason, or were themselves traitors. This ordinance was abrogated by Sec.. 1, Article xi, of the Constitution of 1870, thus leaving the validity of - such laws as were passed by the Legislature during the period of the war to be tested upon general principles, applicable to laws passed by legislative bodies under our system of written constitutions, which constitutions are the tests of the validity of all legislation.
We need only say with reference to the theory that all acts passed by Legislatures of States engaged in rebellion against the United States, were void, that it is one which, so far as we can see, is based upon no principle of general law, nor upon any growing out of the peculiarities of our constitutional -system of government, and that the Schedule of the Constitution of 1865, as to this subject, was a purely arbitary declaration of the will of the body which promulged it.
It must be sustained, if at all, upon the idea, that a State of this Union is such, and can exercise its powers as such — in a word can have legal or con *701 stitutional existence — only by virtue of its relation to and connection with the Federal Union, as one of its integral parts. In this is ignored the principle that underlies our entire theory of government, both State and Federal, as viewed in the Constitution of the United States, on almost every page, that the States composing our Federal Union, are well defined entities — constitutional organizations — having life independently of their connection with the Federal Union.
This principle is distinctly recognized in the preamble to the Constitution of the United States: “We the people of the United States, in order to form a more perfect union, &cthe union of the States having been found imperfect under the old articles of confederation. We need not enumerate the various clauses of the Constitution of the United States in which the principle is recognized. We need but refer to s. 10 of art. 1, containing prohibitions upon the powers of the States, and among others, that no • State shall enter into any treaty, alliance or confederation; make anything but gold and silver a legal tender; pass any bill of attainder, ex post faoto law, or law impairing the obligation of contracts; or without consent of Congress lay any imposts or duties, &c.; and then to the 10th article of the amendments to the Constitution: “ The powers not delegated to the United States by the Constitution, nor prohibited by it to the States are reserved to the States respectively or to the people.”
It will be seen from these clauses of the Constitution, that the States are referred to distinctly in con *702 nection '-with acts of government; that the law-making power of the States is distinctly recognized as existent, by the Constitution of the United States, and certain well defined limitations placed upon its action. Upon sound principles of construction, the States could well have exercised all legislative powers, and so far as the Federal Government was concerned, done all things by them deemed proper and not prohibited by the Constitution of the United States, without the provision in art. 10 of the amendments. But that article distinctly lays down the principle that “the powers not delegated to the United States, nor prohibited to the States, are reserved to the States respectively or to the people.” It will be seen from these clauses that pre-existing organized governments are recognized, having within their respective territorial limits independent spheres of action, and acting within these, not by virtue of their relation to the Union created by the Federal Constitution, but from their own original authority derived, according to our American ideas of government, from the peoples by whom they were established. Such organized State governments, with all legislative powers not prohibited by the, Constitution of the United States, are thus clearly recognized by that instrument. These governments are not in any manner affected in the exercise of their powers by the existence of the Federal Union, except by the grants and prohibitions of the Federal Constitution; and as their existence as State governments is not derived from the Federal Constitution, nor their powers as such from their relation to the Federal Union or its *703 government, simply certain powers formerly possessed being delegated in the Federal Constitution, leaving the reserved powers to be held as they and the delegated powers previously were, — by virtue of the original sovereignty of the States, — it is manifest that within its sphere of action we must look to other and different tests as to the validity of the laws of a State than the simple one of connection with the United States.
In fact the relation of the State governments to the United States, except in reference to the grants of power to the United States and the prohibitions upon the power of the States, has no bearing whatever upon the question of what powers may be exercised by the State Legislatures; nor does such relation, except as indicated, in any way affect or modify the action of the State Legislatures in reference to any matters within their spheres of action. We might refer to the series of unquestioned decisions of the Supreme Court of the United States, holding that the prohibitions of the amendments to the Constitution— e. g. that no one shall be twice put in jeopardy of life and limb, etc. — have no application to the States, but only to the Government of the United States, the States being left to protect their citizens from oppression by the provisions of their own Constitutions. See case of Barron v. City of Baltimore, 7 Pet. R., &c., &c.
It follows necessarily, that the fact that the normal relations of the State of Tennessee to the United States were temporarily suspended during the war, could not have had the effect to render void an act *704 of her Legislature upon a question in no wise connected with Federal relations, but of purely local interest, — the power to legislate upon such question not being derived from the Federal Union or its government, nor prohibited by the Federal Constitution.
The principles which we have announced are abundantly sustained by the decisions of the Supreme Court of the United States. We need only cite the language of the Court in Lane County v. Oregon, 7 Wal., 76,— as follows:
“The people of the United States constitute one nation under one government, and this government, within the scope of the powers with which it is invested, is supreme. On the other hand, the people of each State compose a State having its own government, and endowed with all the functions essential to separate and independent existence. The States disunited might continue to exist; without the States in union, there could be no such political body as the United States. In many articles of the Constitution the necessary existence of the States, and, within their proper spheres, the independent authority of the States, is distinctly recognized. To them nearly the whole charge of interior regulation is committed or left; to them and to the people all powers not expressly delegated to the national government are reserved.”
While we may be permitted to say that we do not think the use of the term “nation” in the above extract appropriate to our Federal' Government, yet the principle laid down sustains the views we have above *705 presented as to the nature of the State governments.
In the case of Texas v. White, 7 Wal., 733, the Court, by Chief Justice Chase, lay down the following upon the direct question of the validity of State legislation during the war by a State. engaged in the rebellion, — the State of Texas. He says:
. “It is not necessary to attempt any exact definitions within which the acts of such a State government must be treated as valid or invalid. It may be said, perhaps with sufficient accuracy, that acts necessary to peace and good order among citizens, such, for example, as sanctioning and protecting marriage and the domestic relations governing the course of descents, regulating the conveyance and transfer of property, real and personal, and providing remedies for injuries to persons and estates, and other similar acts, which would be valid if emanating from a lawful government, must be regarded in general as valid when proceeding from an actual though unlawful government; and that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must be regarded as invalid and void.”
While we do not think this extract strictly accurate in its theory, nor is it assumed by the learned Chief Justice to be so in its details, as a definition of the powers of the State governments, yet it involves a principle upon which such an act as is now under consideration is clearly maintainable, and, in this respect, is sufficient for our purposes.
*706 We would prefer to rest tlie validity of the act upon the broader ground that all acts of a State Legislature are to be declared valid or the contrary, as being in accordance with, or in violation of, either the Constitution of the United States, or of the Constitution of the State. We know of no other test of the validity of a legislative enactment in our American system than this. These constitutions are the supreme law of the land. Legislative enactments are to be tested by them, and by them alone.
We need not further discuss this question. It follows that the act of incorporation of the General Assembly of the Presbyterian Church, whatever be its name, is valid, and that it conferred upon the body the corporate powers contained in the act of incorporation and this body was competent to take and hold the bequests given in the will as trustee for the charities therein designated.
We may say in reference to the argument that there are no beneficiaries designated who can enforce the trust, that, in the language of Judge Green in the case of Dickson et als. v. Montgomery et als., 1 Swan, 369, “it is of the very nature of a charity that the individual beneficiaries are unknown;” and, in addition to this, an action .is given and a remedy provided in the name of the State by ss. 3409, 3410 of the Code, “to bring the directors, managers, and officers of a corporation, or the trustees of funds given for a public or charitable purpose, to an account for the management and disposition of property entrusted to their care, and to remove such officers or trus *707 tees on proof of misconduct, and generally to compel a faithful performance of their duties.”
As to the objection that the bequests are to “superstitious uses,” and therefore void, we need not say that no such objection lies to the will, nor could it be maintained in a Christian country. Indeed, it may be seriously doubted whether, in the United States, where no discrimination is made in law between the professors of any particular religious creed, any such thing as a “superstitious use” can be said to exist. It has been so held in Pennsylvania and Kentucky. See 1 Watts, 218; 2 Dana, 170.
In this view of the case, we need not discuss the questions raised and presented on the tenth item, as to the trusts sought to be imposed upon the executors by the precatory words of said clause. We need only say that without going into an examination of authorities on that question, we incline to the opinion that under the words of that clause giving the property to the executors, “in their own right, trusting nevertheless and believing that under a proper sense of their obligations to their own consciences and their accountability to God, they will, as near as they possibly can, in conformity with what I have herein indicated, pay over and contribute the same to charitable objects and purposes,” — taking the whole clause together, — that no trust enforceable in a court of equity is created, but that the intestator intended to leave this trust to be enforced alone in foro conscientice, and not by the civil tribunals of the country. This is indicated with considerable clearness by the use of the *708 word “contribute,” — a word very generally used and understood in connection with payments made to our various religious organizations, to express the idea of a voluntary gift in aid of the purposes of such institutions.
We may add, that in any event, the kindred „of the testator in this case could have no interest in this fund, as they are by the most unequivocal language excluded from farther participation in his estate; and if the bequests to the charities had failed, the executors would unquestionably have taken the property in their own right by the terms of the will, to the exclusion of the distributees. The testator clearly had the right to make them the objects of his bounty; and to take it from them and to give it to his kindred, who are, by the express language of the will, excluded from all participation in it, ■ would be not to execute a will, but to make one, or rather would be to hold that the testator had no power to give his property to whatever person he might choose, a right clearly given under our law.
We therefore hold, that the bequests to the General Assembly are valid, and the executors bound to pay over the funds to that body.
The decree of the Chancellor will be affirmed, so far as it conforms to the views of this opinion, the result of this opinion being the same arrived at by his decree.
The case will be remanded to Chancery Court for a settlement of this estate, and the disposition of other matters involved in the trusts imposed upon the executors by the other portions of the will.
*709 The costs of this Court and of the Court below and of the future proceedings will be paid out of the fund.