## Adams, County Superintendent, et al. v. Bohon, Executrix, et al.

(Decided June 1, 1917.)

### Appeal from Mercer Circuit Court.

1. Statutes—Doubtful Meaning—Rules of Construction.—The rule that no canon of interpretation which requires that the letter of a statute should be followed when by so doing an unreasonable result is accomplished, has no application to a case where a statute is not of doubtful meaning, and needs no unusual or technical rule of construction to ascertain its purpose.

2. Statutes—Intention—Construction.—The intention of the legislature is the intention as expressed in the statute; it is only when the language of a statute is of doubtful meaning, or where the adherence to the letter of it would lead to an absurdity, injustice, or to contradictory provisions, that a search must be made for the true meaning by the courts.

3. Charities—Cy Pres Doctrine.—The cy pres doctrine as a judicial doctrine, has never been in force in Kentucky.

4. Charities—Cy Pres Doctrine.—The ministerial power of the English chancellor, by which he exercised the King's prerogative power as parens patriae, to control and carry into effect the gifts to charity in general, without any specific purpose being indicated, by applying the cy pres doctrine, does not exist in any American magistrate, judicial or ministerial, and can never exist until it is conferred by the legislature.

5. Statutes—Religious Societies—Society of Shakers.—Section 323 of the Kentucky Statutes, which provides that the lands of any dissolved society shall go to the public schools of the county, does not apply to the Society of Shakers.

ED. C. O'REAR and CHARLES CARROLL for appellant.

C. E. RANKIN, HELM BRUCE and BRUCE & BULLITT for appellee, Irene Bohon.

E. H. GAITHER for appellee, W. E. Pennybaker.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This appeal presents the question whether the lands of the Society of Shakers, located near Pleasant Hill, in Mercer county, have escheated to the common schools of that county, under section 323 of the Kentucky Statutes. A brief statement concerning the history of the society, and its purposes, may be helpful in obtaining a ready comprehension of the precise questions involved.

The Society of Shakers originated in England in 1747; and, while not a branch of or in any way connected with the Quakers, the original members of the Shaker society had been members of the Quaker society. By reason of the peculiar form of worship adopted by the Shakers, they were nicknamed "Shaking Quakers," although they differ from the Quakers in doctrine and practice. They style themselves the "United Society of Believers in Christ's Second Appearing."

The first colony of American Shakers was established at Mount Lebanon, N. Y., in 1774, under the leadership of Ann Lee, who claimed to be Christ in his second reincarnation. Indeed, the origin of the society rests upon the belief in the revelation of Christ's second appearance in Ann Lee. This was the first communistic society established in the United States.

This colony became the parent church, and from it branches went forth and established churches in Massachusetts, New Hampshire, Maine, Connecticut, and in other eastern states; and later, in Kentucky, Ohio, Georgia, and Florida.

The first colony of Shakers in Kentucky was formed at Pleasant Hill, in Mercer county, and is the branch or society whose property the appellant now seeks to escheat.

It is unnecessary to go into the details of the religious belief of this society, further than to say that it was founded upon their conception of the teachings of Christ; that Christ had returned to earth in the person of Ann Lee; that it was the duty of all Christians to live together, and have their property in common; to do acts of charity; and to work for the common good of all in the church. They practiced celibacy because they believed the church, which was to them the world, was a spiritual institution, and that they should discourage all worldly and animal propensities. They did not, however, condemn marriage in other people; and, they mingled freely with the outside world. To them the church

was the nucleus upon which they contemplated a new order would be built and the whole world spiritualized. They regarded ostentation, luxury, and private property as sinful and unchristian; and they lived in groups or "families," the government of the family being parental.

The society's property was held by trustees, each branch or colony selecting its own trustees, subject to the approval of the parent church at Mt. Lebanon. These trustees were given absolute power. As there was no marriage in the society, the members easily recognized that before they could accomplish the conversion of the world, the society would die out unless it should have further accession of members; and so, it became a rule with them to seek children, and to accept, and in fact to seek converts from the outside world. It was, however, a condition precedent to one's entering the society that he should renounce all connection with the world, and if he brought any property with him, it went into the common purse. If one withdrew from the society, he simply ceased to exist and was not entitled to share in any of the property of the society.

The Shaker society at Pleasant Hill was organized in about 1805; and, in 1814, its 116 members signed a covenant setting forth their religious belief and the principles upon which the society should be conducted. They were a frugal and industrious people, with strong religious tendencies; and, while they prospered in business, their numbers did not greatly increase.

By the year 1862, the society had acquired thirty-five tracts of fine land, which it had incorporated into one body. As early as 1830, the society had become comparatively wealthy, and practically all the buildings that now exist had then been erected. About this time two dissatisfied members, Gass and Bonta, seceded from the society and brought an action to dissolve it, and to have apportioned to them their shares of the land and the other property of the society. The circuit court dismissed their petition, and, upon appeal, it was affirmed by this court in 1834, in the case of Gass and Bonta v. Wilhite, 2 Dana 170, 26 Am. Dec. 446.

Until shortly after war between the states, the community continued to prosper; and, in about 1870, it had 362 members living in four "families," or groups, and owned most of the good land in the eastern portion of Mercer county. At this time each of the four families had an allotted boundary of land, and each family was

independent of the others in the management of its affairs, but all were governed by one set of trustees selected by the community and approved by the home church at Mt. Lebanon.

Shortly thereafter, the older and wiser members of the society began to die, and those remaining having grown up in the community without contact with the world and with no business training, were not successful from a business point of view. Subsequently, they were compelled to sell a large part of their best land. New members ceased to come in, and the society began to dwindle in numbers until they were reduced to two families, one known as the Shelton and Sutton family, and controlled by James Shelton, a very old man, and Jane Sutton, a woman of great intelligence, but neither of them having any business ability. The other family was under the control of two brothers, both of whom had been raised at Pleasant Hill, and both being greatly above the average in ability. One of these brothers is the appellee, Dr. W. F. Pennybaker.

Under the management of the three trustees of the society, James Shelton, Jane Sutton, and John Pilkington (all being members of the Shelton and Sutton family), large debts were created, of which Dr. Pennybaker had no knowledge. These debts were held by George Bohon, of Harrodsburg. It was apparent that something had to be done to satisfy these debts. Jane Sutton was removed as trustee, and Dr. Pennybaker became one of the trustees. The home society was called upon for assistance, and declined to render any, except upon the condition that the members be removed to one of the eastern societies and the land at Pleasant Hill turned over to that society. To this none of the seventeen or eighteen members then in the society was willing to consent. The few remaining members were all very old, and, with the exception of Dr. Pennybaker, none of them was able to make a living if turned upon his own resources. All of them, however, desired to spend the few remaining years of their lives at the place where they had been raised.

Finally, an arrangment was made with Bohon, the creditor, that he should take over the property, consisting of more than 1,500 acres, besides the personal property, put it in repair, support the members during their lives, provide them with all necessary funds while they lived, and furnish them burial at their deaths, in consideration that their lands and personal property should be

conveyed to Bohon. A meeting of the society was called to consider the proposition, and all of the members agreed to it. The contract was submitted to and approved by the home society. This contract was carried out in 1910 by the six living members of the society conveying all of their lands to George Bohon, in consideration of the covenants upon his part as above recited; and the further covenant that he would set aside and hold the sum of $5,000.00 to be used and expended by and for them, as their needs might require.

However, as Dr. Pennybaker's "family," which held a comparatively small part of the land, had incurred none of these debts, Bohon, in 1913, conveyed 576 acres of the tract to Dr. Pennybaker under the same terms and conditions upon which Bohon had taken the land; and, under this deed Dr. Pennybaker now holds this tract in trust for the members of his family still living.

In 1916, the appellant, Ora L. Adams, as county superintendent of the common schools in Mercer county, brought this action against the four living members of the society, and Bohon's executrix, to set aside the conveyance to Bohon, upon the ground that the society had been dissolved and its lands escheated to the common schools of the county under the provisions of section 323 of the Kentucky Statutes, which reads as follows:

"If any society holding lands shall dissolve, the title to such land and appurtenances shall vest in the trustees of the county seminary in which the land may lie, for the use of such seminary; and if there be no such seminary, then in the county court, for the benefit of common schools in the county. The provisions of this chapter shall not apply to the society called Shakers, who shall have the same right to acquire and hold real estate as they have had prior to the passage of this law."

The petition alleged that the society had abandoned the purposes for which it had been organized and had sold all of its property to Bohon, and that these facts operated to dissolve the society under the rule laid down in Trustees Presbyterian Church v. Alexander, 20 Ky. L. R. 391, 46 S. W. 503.

By the time the suit was brought in 1916, Martha Olson and Christine Johnson, two of the six members, had died; and, since this action was filed, Sara Pennybaker has died, leaving Dr. W. F. Pennybaker, Mary Settle and James Howard as the only surviving members of the society.

It will be observed that section 323 of the Kentucky Statutes, above quoted, relates to the disposition of the property of religious societies upon their dissolution, and provides that the chapter of which said section is a part shall not apply to the Society of Shakers, "who shall have the same right to acquire and hold real estate as they have had prior to the passage of this law."

It will further be noticed that the first part of the section relates to the dissolution of the property of religious societies, while the closing section relates to their right to acquire and hold real estate; and it is upon this language of the section, when read in connection with the history of the statute upon the subject, that appellant bases her argument and asks that the property be escheated to the common schools.

The circuit court dismissed the petition, and the plaintiff appeals.

Plaintiff must recover under the statute, or she can not recover at all. The decision of the question makes necessary a brief review of the legislation upon the subject in this state.

The first statute upon the subject is the act of February 1, 1814 (2 M. & B. 1347). This act provided, in substance, that if any society of Christians should have acquired, or should thereafter acquire, a piece of ground "for the purpose of erecting thereon a house or houses of worship, graveyard, and a pound for horses," but who have received a title thereto by devise or conveyance to trustees for the benefit of the society, it should have the right to fill vacancis in the office of trustee by appointing new trustees to support the legal estate according to the rules of the society, the number, however, not to exceed five, and might produce the names of the trustees so selected to the county court and have them there recorded; and that the trustees so selected or appointed should be vested with the legal title for the benefit of the society, and should have power to do any legal act necessary for its uses and to maintain any action necessary for the preservation of its property.

This act further provided for a divided use of the property in case of schism or division, and concluded with a proviso that the quantity of real estate that might be acquired and vested in trustees under the act should not exceed four acres. This is the substance of the entire act; it contains no provision relating to a dissolution of religious societies, or an escheat of their property.

The act of 1814 was amended by the act of January 27, 1824 (2 M. & B. 1348). The act of 1824 purports only to amend the act of 1814, which was entitled:

"An Act for the Benefit of Religious Societies in this Commonwealth." The amendatory act of 1824 consisted of two sections, which read as follows:

"Sec. 1. Be it enacted by the General Assembly of the Commonwealth of Kentucky. That any religious society heretofore formed, or which may hereafter be formed, may acquire by purchase or donation any number of acres of ground not exceeding ten, in one or more lot or lots, under the same rules, regulations and restrictions contained in the above-recited act, and for the purposes therein mentioned; and so much of the above recited act as restricts any religious society from holding more than one lot of ground, be and the same is hereby repealed; provided, however, that this act shall not be construed to authorize any society to hold more than ten acres.

"Sec. 2. Be it further enacted, That if any society so holding lands shall dissolve, the said land and appurtenances shall be vested in the trustees of the seminary of learning of the county where such land may be, for the use and benefit of said seminary; and if there be no seminary in said county, then and in that case, the land and appurtenances shall be vested in the county court, for the use of common schools in said county."

It will be noticed that this act made two changes in the statute of 1814, namely: It permitted the society to hold as much as ten acres of land; and, by the second section it provided that if any such society should dissolve, its land should go for school purposes. This was the first appearance, in Kentucky, of a statutory provision relating to the dissolution of religious societies.

The suit of Gass and Bonta v. Wilhite, *supra*, in which the nature and validity of the Shaker covenant, and its effect upon the rights of the seceding members, was tried and decided under the act of 1814 as amended by the act of 1824. In that case, this act was relied upon by the seceding members, who insisted that the entire Shaker covenant was invalid insofar as it attempted to control the rights of property, and especially that it was invalid insofar as the society sought to hold more than the very small amount of land allowed by the statute. But this court, in an extended opinion, in which it took up each of the several contentions of the plaintiffs, finally

held that the statute did not affect the right of the Society of Shakers to hold their property, which, at that time, embraced quite a large portion of land now in controversy. That conclusion is found in the following excerpt taken from the opinion, namely:

"It is further objected to the validity of this trust, that it is repugnant to the general policy of our law, with regard to religious societies, as indicated by the act of 1814, 2 Dig. 1057, which, in authorizing them to hold their churches and adjacent ground, through the intervention of a succession of trustees, limits the quantity so to be acquired, and held, to four acres. But it will be found, on reference to the act, that it contains no language which can be construed as at all restrictive of the general capacity of religious societies to acquire and hold property in other modes than that pointed out by the act. It only restrains the application of the benefit of its own provisions, to an acquisition not exceeding four acres." 2 Dana 184.

The next statute upon the subject is found in chapter 14 on the subject of "Charitable Uses and Religious Societies," in the Revised Statutes, adopted in 1851.

In Gass and Bonta v. Wilhite, *supra*, this court had held that the statute of 43 Elizabeth relating to charitable uses was in force in Kentucky. When the compilers of the Revised Statutes of 1851 came to consider the subject, they drafted chapter 14, which was a combination of the Act of Elizabeth and the statutes of 1814 and 1824 relating to the subject of religious societies. The first two sections of this chapter 14 of the Revised Statutes is substantially a readoption of the statute of 43 Elizabeth, while the third and fourth sections of the chapter substantially cover the provisions of the acts of 1814 and 1824, raising, however, the number of acres that might be held by a religious society from ten acres, as fixed by the act of 1824, to fifty acres.

Omitting the five sub-sections of section 3, which are not material to the case now before us, sections 3 and 4 of the act of 1851 read as follows:

"Sec. 3. No church or society of Christians shall be capable of taking or holding the title, legal or equitable, to exceeding fifty acres of ground; but may acquire and hold that quantity for the purpose of erecting thereon houses of public worship, public instructions, a parsonage, a graveyard, and a horse pound.

"Sec. 4. If any society holding lands shall dissolve, the title to such land and appurtenances shall vest in the trustees of the county seminary in which the land may lie, for the use of such seminary; and if there be no such seminary, then in the county court, for the benefit of common schools in the county. The provisions of this section shall not apply to the society called Shakers, who shall have the same right to acquire and hold real estate, as they have had prior to the passage of this act."

It will thus be noticed that the revision of 1851 is a substantial re-enactment of the acts of 1814 and 1824, with two changes, only: (1) the amount of land permissible for such society to hold was raised from ten acres to fifty acres; and (2) there was added to the fourth section (which was the same as the second section of the act of 1824), the clause that the provisions of this *section* should not apply to the society called Shakers, who should have the same right to acquire and hold real estate as they had prior to the passage of the act. This was the first appearance of the provision exempting Shakers, although they had long been owning large tracts of land in Kentucky, and this court had said in Gass and Bonta v. Wilhite that the acts of 1814 and 1824 did not apply to Shakers.

Appellant insists that this provision excepting Shakers did not relate to the devolution of their property upon the dissolution of the society, but, by its terms, related only to the limitation upon the quantity of land they might hold; and that, since that provision has been carried to this day in the same or similar statute and in the same relative position with regard to the other sections of the statute, it should now be read, as it then should have been read, by applying it only to the quantity of the land which the society could acquire. This contention, if followed, would not exempt the society's land from escheating, upon its dissolution, so long as the exemption related only to that section of the statute. The revisers evidently thought the exemption related to the restriction upon the quantity of land the society might own, since at the foot of the page of the Revised Statutes of 1851 containing this section, there is this foot-note by the commissioners who compiled the statutes: "The last clause was an amendment by the legislature, made under the apprehension that the Society of 'Shaking Quakers' might be embraced by the language of the section. Such

was not the opinion or the intention of the commissioners."

It is worth mentioning that one of the revisers of the statutes of 1851 was Judge S. S. Nicholas, of Louisville, who had written the opinion of the court in Gass and Bonta v. Wilhite. He, of course, was familiar with the decision in all of its aspects; and, it followed from the explicit language of that opinion that the statute did not apply to Shakers. However, the legislature, evidently out of abundant caution, inserted the exempting clause which appears in section 4 of the revision of 1851.

Furthermore, it will be observed that the exempting clause of the Revised Statutes (1851), *supra*, confines the exemption to the provisions of "this section," namely, section 4, covering the subject of the dissolution of the society and the devolution of the title to its property to the schools, adding the further provision that the Shakers should have the same right to acquire and hold real estate as they had had prior to the passage of the act. Of course, since the Shakers had the right under the decision in Gass and Bonta v. Wilhite, *supra*, to hold any amount of land they might purchase, regardless of the limitations in the statute, the only new effect given by the provision last above quoted in the revision of 1851 was, that the provision of section 4 relating to the devolution of church property upon the dissolution of the society should not apply to Shakers. The exempting clause was restricted to section 4, which treated of that subject; it did not pretend to exempt that society from any other section or provision of the statute.

The law upon this subject stood thus unchanged until the enactment of the General Statutes of 1873. Chapter 13 of that revision, entitled "Charitable Uses and Religious Societies," is, with one exception, substantially the same as chapter 14 of the Revised Statutes of 1851, with the addition of section 5 thereof, providing for the sale of real estate held by religious societies and the re-investment of the proceeds. The change or exception referred to is found in section 4 of this chapter of the General Statutes, where the word "section" as used in the Revised Statutes of 1851, is changed to "chapter" in the General Statutes, and the word "act" (being the last word of the section in the Revised Statutes), is changed to "law," in the General Statutes.

Section 4, therefore, as it appeared in the General Statutes of 1873, reads as follows:

"If any society holding land shall dissolve, the title to such land and appurtenances shall vest in the trustees of the county seminary in which the land may lie, for the use of such seminary; and if there be no such seminary, then in the county court, for the benefit of common schools in the county.  The provisions of this chapter shall not apply to the society called Shakers, who shall have the same right to acquire and hold real estate, as they have had prior to the passage of this law."

Evidently, the compilers of the General Statutes, finding the provision excepting the "Shakers" from the provision of section 4 of the act of 1851, which related solely to the devolution of a religious society's property upon its dissolution, coupled in the same clause with a further provision that the Shakers should have the same right to acquire and hold real estate as they had prior to the passage of the act, recognized the inconsistencies of the provisions of that section.  It will be remembered that section 3 of the act of 1851 related to the acquisition of real estate by religious societies and confined them to fifty acres of ground, while section 4, as above stated, provided for the devolution of society property to the school fund upon the dissolution of the society.

So, when section 4 of the act of 1851 provided that Shakers should be excepted from the provision of that section, one would naturally suppose the purpose was to exclude their property from escheat upon the dissolution of the society, although the concluding sentence of the section stated that Shakers should have the same right to acquire and hold real estate to an unlimited extent, as they had theretofore possessed—an entirely different subject-matter.

Consequently, when the General Statutes of 1873 changed section 4 by providing that none of the provisions of chapter 13 on Charitable Uses and Religious Societies should apply to the Shakers, it is difficult to avoid the conclusion that the revisers enlarged the exception intentionally, and with a purpose.  The chapter thus excepting the Shaker society from all of its provisions, has remained unaltered for more than forty years.  It was readopted *verbatim* as section 323 of the Kentucky Statutes of 1894, and still remains the law upon the subject.

We have been cited to many authorities in the able brief of counsel for the appellant, to the effect that a statute should be construed according to its spirit and intent, rather than according to the strict letter thereof,

and that this is particularly true in the case of ambiguous statutes. Or, to state it differently, statutes should receive a sensible construction such as will effectuate the legislative intention, and, if possible, so as to avoid any unjust or absurd conclusion; and, that there is no canon of interpretation which requires that the letter be followed when by so doing an unreasonable result is accomplished.

The difficulty we have, however, in applying the rule invoked to this case is, that the statute is not of doubtful meaning, and needs no unusual or technical rule of construction to ascertain its purpose.

We cannot say, with reason, that when the word "section" was stricken from the statute of 1851, and the word "chapter" was substituted therefor in the revision of 1873, the intention of the legislature was to make the exception apply as the original exception was intended to apply, to the limitation upon a religious or charitable society to hold only fifty acres of ground. On the contrary, it seems to us that the change thus deliberately made, was made with the express purpose of exempting the Shaker society, not only from the one limitation of the former chapter, but from all the provisions of the chapter. The intention of the legislature is the intention as expressed in the statute. Brown v. Kaufman, 131 Ky. 642; Commonwealth v. International Harvester Co., 131 Ky. 551. It is only when the language is of doubtful meaning, or where the adherence to the letter of it would lead to an absurdity, injustice, or to contradictory provisions, that a search must be made for the true meaning by the courts. Newport, &c. Burial Association v. Clay, 170 Ky. 633; Ky. Sts., sec. 460.

In the course of his able argument, counsel for the appellant suggested the inquiry as to who would be entitled to the property of the Shaker society in the event chapter 17 of the Kentucky Statutes, including section 323, had never been enacted, and no law regulating this subject had ever been adopted by the General Assembly. It is then suggested that possibly the *cy pres* doctrine might be applied to the case. We fail, however, to see how this suggestion can affect this decision, for two reasons: first, that chapter 17 having been adopted by the legislature, must control the case; and, secondly, because the *cy pres* doctrine, as a judicial doctrine, has never been in force in Kentucky. Spalding v. St. Joseph's Industrial School, 107 Ky. 382, 402.

In the Spalding case, the court points out the fact that the English chancellor was not only a judicial, but also a ministerial officer; that as judge of the High Court of Chancery he acted judicially; but as keeper of the King's conscience, in which position he acted ministerially, he exercised the King's prerogative power as *parens patriae* to control and carry into effect gifts to charity in general, without any specific purpose being indicated, and to devote gifts made for charitable uses which were illegal, or contrary to public policy, or impossible to be carried into effect, to such other charitable purposes—*cy pres* the original gift—as he pleased. This ministerial power of the English chancellor was the progenitor of the *cy pres* doctrine.

It is well established, however, that no such power exists in any American magistrate, judicial or ministerial, and none can exist until it is conferred by the legislature. Perry on Trusts, section 718.

The conclusion which seems to have been drawn by counsel for the appellant from this line of argument is, that unless the land of the Shakers was, upon the dissolution of that society, devoted to a specific purpose by some statute of Kentucky, the state acquired the land and holds it subject to legislative action; and, that since the statute (sec. 323, Ky. Sts.) provides that the land shall go to the school fund of the county, the appellant has the right to maintain this action. That proposition, however, takes us back to the original starting point, and raises the question we have heretofore considered as to what section 323 means, and whether the Shaker society is exempt from its provisions.

Indeed, appellant rests her claim to recover under section 323; and, she must necessarily do so, since, in the absence of a statute, she would have no right whatever in the premises.

The judgment of the chancellor dismissing the petition was correct, and it is affirmed.