## Easum, et al. v. Bohon, Executrix, et al.

(Decided May 7, 1918.)

### Appeal from Mercer Circuit Court.

Trusts—Resulting or Presumptive Trust.—Where property is voluntarily donated, granted or contributed for a specific purpose and for the accomplishment of defined objects, if such purposes and objects are illegal or become accomplished, or there should be an abandonment by the association or corporation entrusted with the carrying out of the purposes, or they should be dissolved, equity raises a resulting or presumptive trust in favor of the donor, contributor or grantor to the unused portion of the property contributed, or to his heirs, but if he received a valuable consideration for the property, no such trust arises.

2. Trusts—Resulting or Presumptive Trust.—A resulting or presumptive trust of the nature described is a creature of equity, and has its foundation on the presumed intent of the grantor or contributor (without consideration) that there should be a reverter of the unused portion of the property upon the contingencies mentioned to his use and benefit, or if dead, to the use and benefit of his heirs or next of kin. But such presumption is rebuttable, and where the facts show that it was the intention of the grantor to part forever with the entire interest in the property, and that no such reverting interest should ever arise in his favor, then equity will not decree a trust in favor of the grantor or of his heirs or next of kin if he be dead.

3. **Trusts—Resulting Trust—Charities—Society of Shakers.**—Where a communistic society called Shakers was organized under written articles signed by its members and to which all incoming members agreed, and in which it was stated that the incoming member might bring in what property he saw fit after the payment of his debts and a provision for his children upon the agreement that he forever relinquish and release any interest therein on behalf of himself or any of his heirs upon consideration that it be used by the society, one of the chief objects of which was to support, maintain and care for its members throughout their lives. Held, that this was sufficient evidence to rebut the presumption that a resulting trust was intended by the member when he brought in his property, and that the comfortable support throughout his life was a sufficiently valuable consideration to defeat a resulting trust upon dissolution of the society in his favor or if dead in favor of his heirs or next of kin.

M. H. THATCHER and CHARLES CARROLL for appellants.

HELM BRUCE, C. E. RANKIN, E. H. GAITHER and BRUCE & BULLITT for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

This appeal presents the question as to whether the heirs and next of kin of deceased members of the society called Shakers, located near Pleasant Hill in Mercer county, Kentucky, are entitled, through the medium of a resulting trust, to their ancestors' proportion of the property of the society when it ceases to be such upon dissolution, which it is charged occurred in 1910. A sufficient history of the society, its character, objects and purposes, including the motives prompting its members to form and enter into it, will be found in the opinion in the case of Adams, County Superintendent, et al. v. Bohon, Ex'x, 176 Ky. 66. That case was the beginning of this litigation and had under consideration and disposed of the question involving the right of the Board of Education of Mercer county to have the property escheated for the benefit of the common schools of the county under the provisions of section 323 of the Kentucky Statutes, which question was determined adversely to the contentions of the board of education, since it was held that the section of the statute referred to did not by its express terms apply to the property of the society called Shakers.

While that suit was pending in the court below appellants here filed their intervening petition and amended petition in which they averred that they were the direct

descendants of one John Shain, who was one of the found-
ers of the society in Mercer county, and one of the signers
of the "Shakers' Covenant," which was signed and ac-
knowledged by all of the members of the society in 1814,
and immediately put to record in the county court clerk's
office; that at the time of becoming a member of the so-
ciety their ancestor brought into and donated to the so-
ciety a considerable amount of property, the extent and
nature of which they do not know, and throughout his
life, which continued until 1870, he performed much and
valuable services to the society, for which he received no
compensation, and that many other members did the same
but perhaps in different proportions, and that all of the
property so brought and donated under the terms of the
covenant was appropriated, used and invested by the
society, finally finding its way into a valuable landed es-
tate located in the county containing a large number
of acres which formed the principal part of the society's
property at the time of its alleged dissolution.; that "none
of the property belonging to said society was owned by
individual members thereof, and no individual member
of said society had a private or individual interest in
said property, but all of the property of said society be-
longed to the society for the common use and benefit of
said society, and for charitable purposes, and was do-
nated for said purposes by the members of said society."

In the prayer the court was asked to adjudge the so-
ciety to have been a purely charitable institution; that
its purposes and objects had failed and it had become dis-
solved because of the few remaining members having at-
tempted to convey the property to strangers and to di-
vert it from the purposes for which the society was or-
ganized; that they be adjudged the right to recover upon
an accounting their ancestors' pro rata part of the pres-
ent value of the property, and that they be permitted to
sue for themselves and for the use and benefit of others
similarly situated, and that the case be referred to the
master commissioner for the purpose of ascertaining
who had been members of the society from the beginning,
how much property each member had brought in at the
time he became such, the amount and value of the services
which each member rendered to the society as long as he
remained a member, or until his death, if he remained
faithful until the last, the heirs or next of kin, if any now
living, of each member, and to ascertain and report all

other facts necessary to enable the court to make a just and equitable distribution of the property among the descendants of all deceased members and those living at the time of the alleged dissolution.

A demurrer was filed to appellant's pleading, which was sustained by the court and their suit dismissed, and to reverse that judgment they prosecute this appeal. The pleadings contain a copy of the covenant entered into in 1814 alluded to above, and also an instrument enlarging or extending that covenant, called a "Covenant or Constitution," which was adopted by the society in 1844, and which does not materially change or alter the nature and purposes of the society or the tenets or practices of its members, but enlarged upon them, and was prompted because the members of the society, as therein stated, felt "the importance not only of renewing and confirming our spiritual covenant with God and each other, but also of renewing and improving our *social compact* and amending the written form thereof."

The right of a member of the Shaker society upon seceding therefrom to recover the amount of the property which he brought into the society, or for the services which he rendered while a member, was before this court in the early case of Gass & Banta v. Wilhite & Others, 2 Dana 170, in which case a majority of this court as then constituted determined that the society was a charitable institution, or at any rate that it had charitable features, and that a seceding member could not upon withdrawal demand or recover from the society the property which he had put into it. It was so held because the terms of the original covenant under which the property was brought in by the member when he became such were broad enough "to convey the idea of an absolute divestiture of all individual interest in the property (in the seceding member) otherwise than as members of the society," it being further held that such construction of the language just quoted was fortified by another stipulation in the covenant that none of the members "shall ever make any account of labor or property or services, devoted by us, as aforesaid, or bring any charge or debt or damage, or hold any demand whatever against the society, on account of services or property, rendered or consecrated to the aforesaid sacred and charitable uses."

It would render this opinion too long to incorporate into it all of the stipulations in the two articles of associa-

tion or covenants of the Shaker Society referred to bearing upon the question involved, and we will content ourselves with a reference to the two cases, *supra*, for a more complete detailed history of the society, taking from the two covenants only such parts as may serve to illustrate the points to be discussed.

It will at once be seen that appellants claim the right attempted to be asserted herein under the doctrine of resulting trusts. They contend that the property which each member brought into the society, as well as the value of the services which each member rendered to it while such, constitutes a trust fund the legal title to which was held by the society through its trustees solely for charitable purposes, which purposes have now failed and have ceased to be carried out, and that the unused property of the society, which is that now in contest, reverts to the donors, or, if they be dead, to their heirs or next of kin.

The doctrine of resulting trusts is a familiar one in equity jurisprudence and it arises in several different ways, one of which is where the donor conveys, either by will or deed, property for a certain purpose, which purpose fails, or it becomes accomplished with a part of the property unused, or the one to whom it is so conveyed abandons the purpose and declines to further carry it out, or where the beneficiaries are so indefinite that the intention can not be carried out, or the purpose is illegal. Story's Equity Jurisprudence, 13th ed., vol. 2, sec. 1196a; Perry on Trusts, 6th edition, vol. 1, sec. 125; Bispham's Principles of Equity, 8th edition, secs. 87-88; 39 Cyc. 104. When the facts attending the grant are such as to authorize it, a court of equity when the contingency arises will create such a trust for the benefit of the donor, if living, or his heirs or next of kin if he be dead, and adjudge to them the unused portion of the property so donated. This is upon the idea that the donee of the property did not take a beneficial interest, but took it as a trustee for the purpose of accomplishing the intentions of the donor in making the conveyance, and that there was an implied intention or understanding on the part of the donor that if the property for any reason should cease to be used for the purposes he intended when he appropriated it, it should revert to him if living, or if dead, to his heirs or next of kin through the operation of the doctrine of resulting trusts. But the standard works

upon equity jurisprudence, *supra,* and others, as well as all of the adjudicated cases upon the subject, say that the presumed intention of a reverter upon which the doctrine is founded may be rebutted so as to defeat the application of the doctrine. This, according to many authorities, may be done by parol evidence (Bispham's Equity, Sec. 83), but all of them agree that it may be done by the written terms under which the appropriation, contribution or grant is made. Indeed this character of trusts are sometimes called presumptive trusts, as will be seen in Bispham's Equity, *supra,* sec. 78, wherein it is said:

"Trusts by implication of law may arise either for the purpose of carrying out the *presumed* intention of the parties or they may be entirely independent of, or even contrary to, intention. Trusts of the first class are said to *result* by operation or presumption of law from certain acts or relations of parties from which an intention to create a trust is supposed to exist, and they are, therefore, called resulting or *presumptive* trusts."

The other class of implied trusts there mentioned as arising independent of intention or contrary to it is a creature of equity employed for the assertion of the rights of the parties or the frustrating of fraud, and has no application to the character of trusts now under consideration. If, therefore, in the instant case the record furnishes sufficient evidence to rebut the presumption of the intention that a resulting trust should arise and a reverter of the property ensue for the benefit of appellants' ancestor or his heirs or next of kin, and the same with reference to all other members of the Shaker society, then, under the doctrine referred to, no such trust would arise so as to entitle the appellants and others similarly situated to the relief which they asked.

In the 1814 covenant, in section three, referring to the property which the members brought in, it is said: "And the joint interest of the church thus united and established by the free will offerings of the members respectively shall be held and possessed by the whole body jointly as their natural and religious right, that is all and every individual of or belonging to the church shall enjoy equal rights and privileges in the use of all things pertaining to the church according to their order and as every one has need without any difference being made on account of what any one brought in and it shall be the duty of all the members to support and maintain the joint

interest of the church according to their several abilities as members one of another each in his or her own order improving the manifold gifts of God for the good of the whole."

Section 7 of the 1814 covenant is a solemn agreement among the members that "We shall never hereafter make any account of any property, labor or service devoted by us to the purpose aforesaid, or bring any charge or debt or damage or hold any demand whatever against the society or community or any member thereof on account of either property or service given, rendered or consecrated to the aforesaid sacred and charitable uses," &c. These, and other provisions, as was held in the 2 Dana case, *supra,* manifest in as solemn and forceful terms as it was possible to employ an intention on the part of the members *never* to make claim for any of their property brought into, or for services rendered for, the society. But, as if to make it stronger, such intention was again declared in the "Covenant or Constitution" adopted in 1844, where in article 7, section 2, it is said:

"Whereas in pursuance of the requirements of the gospel, and in the full exercise of our faith, reason and understanding, we have freely and voluntarily sacrificed all self interest, and have devoted our persons, services and property as aforesaid to the pious and benevolent purposes of the gospel: Therefore, we do hereby solemnly and conscientiously, unitedly and individually, and for *ourselves, heirs* and *assigns,* release and quit claim to the deacons, or those who, for the time being, are the acting *trustees of the church,* for the uses and purposes aforesaid. All our private, personal right, title, interest, claim and demand, of, in and to the estate, interest, property and appurtenances, so consecrated, devoted and given up; And we hereby jointly and severally promise and declare, in the presence of God and before witnesses, that we will never hereafter, neither dirctly nor indirectly, under any circumstances whatever, contrary to the stipulations of this covenant, nor require any account of any interest, property, labor or service, nor any division thereof, which is, has been or may be devoted by us, or any of us, to the uses and purposes aforesaid."

However, as if to remove all doubt of the intention of the member in bringing in his property and rendering service to the society, it is provided in both instruments

that a condition precedent to becoming a member was that all of his debts should be paid, and that he should make suitable provision for his children, if any, and that no property should be brought in except such as might remain after those duties had been performed. Thus the stipulation with reference to the provision for children is section 4 in the covenant of 1814, which reads:

"That previous to becoming a member of this church or subscribing to this covenant those that have immediate heirs as children must have settled with such of them as are of lawful age by giving or offering to them at least what the law requires as an acknowledgment and as much more as they think proper to give them, and if convenient receive a discharge from them, and if they have children that are under age they are to make a reserve of property sufficient to make a settlement with them in the same manner, such reserve being clearly stated in writing wherein the trustees or agents of the church shall be obligated and bound to settle with them accordingly as they become of age, the church having the use of such property until the time of such settlement."

Substantially the same thing is repeated in section 3, article 2, in the "Covenant or Constitution" of 1844, where the members are required "to settle all just and equitable claims of creditors and filial heirs, so that whatever property they possess may be justly their own." From these facts it would appear that the donor of the property herein sought to be recovered effectually dissipated any presumed intention on his part that there should ever be a reverter of any of it in his favor, or in favor of any child or its descendants, since he had made provision for the latter before he put any of the property in. It would seem, therefore, that the very foundation for the presumption upon which rests the resulting trust and consequent reverter here relied upon is wanting, and that no such can arise under the facts of this case in favor of the appellants.

We have not overlooked the fact that the contributions involved were made upon the terms and under the conditions referred to "for the purposes aforesaid," some of which may be conceded to be purely charitable in their nature, yet others are applicable only to the member in supplying his temporal wants and social needs which he enjoyed and obtained from the "community" or "social compact," terms descriptive of the relation-

ship assumed by the members as found in the two covenants.

In support of appellants' claim that a resulting trust arose in their favor upon the dissolution of the Shaker Society, we are referred to the following authorities: McDaniel v. Watson, 4 Bush 234; Taylor v. Rogers, 130 Ky. 112; Grundy v. Neal, 147 Ky. 729; Story's Equity Jurisprudence (second edition), vol. 2, sections 1200 and 1156; 11 Corpus Juris, section 109, page 379; Coe v. Washington Mills, 149 Mass. 543; McAlhany v. Murry, 89 S. C. 440; Mott v. Danville Seminary, 129 Ill. 403, and Venable v. Coffman, 2nd, W. V. 310, all of which hold in substance that when the purposes for which property is conveyed fail, or if to a charitable association or corporation it becomes dissolved, a resulting trust arises in favor of the grantor or donor or his heirs entitling him to recover the unused portion of the property granted or donated, except in jurisdictions where the cypres doctrine prevails with reference to charities. Under the later decisions of this court, as will be seen from the case of Adams, County Superintendent, et al. v. Bohon's Admrx., et al., *supra,* this latter doctrine is not recognized in this state in the administration of charitable trusts. But the authorities relied on permit the resulting trust to arise only when the transfer or granting of the property was voluntary and without consideration. This feature is absolutely essential to the creation of the trust, and if there exists a consideration going to the transferer or grantor no trust will arise in his favor or in favor of his heirs or next of kin after his death for the reason that he has received compensation for the property and parted with all interest in it, and there is consequently nothing left to revert, and this rule applies whether the trust or devoted use be a charitable one or a strictly private one. All authorities are agreed upon this proposition, but we append only the following in addition to those cited above: Carroll Co. Academy v. Gallatin Academy, 104 Ky. 621, 20 Ky. L. R. 824, 47 S. W. 617; Fuquay's Heirs v. Trustees of Hopkins Academy, 22 Ky. L. R. 744, 58 S. W. 814; Gibson v. Armstrong, 7 B. Mon. 481; Lutes v. L. & N. R. Co., 158 Ky. 259, 164 S. W. 792; Morrow v. Slaughter, 5 Bush 330; McElroy v. Pope, 153 Ky. 108; Bispham's Equity, section 90; Perry on Trusts, section 158.

The rule held and applied by the courts generally, including our own, as will be seen from the cases, *supra,* is well stated in the section of Perry on Trusts referred to, in this language: "But if the conveyance is by deed for a valuable consideration the grantee will take the beneficial interest if the trust fails to be declared, or fail in any way; for there can be no resulting trust where the grantee pays a valuable consideration for the estate."

In most of the cases cited from this court the dedication or granting of the property was to a charitable institution, in some instances churches, and in some schools, but in every one of them where there was a valuable consideration for the devoting of the property it was declared that no trust would result in favor of the dedicator or grantor or in favor of his heirs. Indeed this proposition is conceded by counsel for appellants, but they insist that there was no consideration going to the members of the Shaker society who contributed their property and services to it. It is admitted that each of them was entitled to and did, at least so long as they remained members, receive a support consisting, of course, of supplying them with all of their worldly needs in the way of provisions, lodging, clothing, medicine, nursing, physicians, and in fact everything necessary to human existence. They were also permitted to enjoy the pleasures and benefits flowing from a society of their own choosing and selection. All of their earthly wants, physical necessities, and social enjoyments were guaranteed to them by the society, and we are unable to preceive how it can be denied that a guarantee of such necessities, comforts and luxuries does not constitute a valuable consideration. Indeed, we are not without high authority holding that the things mentioned do constitute a valuable consideration. In the case of Goesele, &c., v. Joseph M. Bimeler & Others, 14 Howard 589, the Supreme Court of the United States had under consideration a state of circumstances almost similar to those we have here. In that case the society of which the plaintiff's ancestor was a member was called "Separatists." It had not dissolved, but it was sought by the petition to obtain a partition of the property and have plaintiffs' part which they claimed to inherit from their deceased ancestor adjudged to them. The rules of that society governing its property and its members while living together in a communistic capacity were

very similar to those of the Shakers in this case, being almost identically the same. As one of the reasons for denying the relief the court in its opinion said:

"The ancestor of the complainants entered into the contract fairly and with a full understanding of its conditions. The consideration of his comfortable maintenance, under all circumstances, was deemed by him an adequate compensation for his labor and property contributed to the common stock."

In the case of Schwartz v. Duss, 187 U. S., page 8, the Supreme Court again had before it the question of the right of descendants of members of a society called the "Harmonie Society," whose objects and purposes, religious views, modes of living and communistic government were in many respects similar to those of the Separatists and Shaker societies, to property which their ancestor while a member contributed to the society. The property there was set apart by the contributors for purposes similar to those we have here, and it was agreed by the member, as here, that he should never be entitled to demand an accounting of the contributions, whether of lands, goods, money or labor, and that if he withdrew he should not as a matter of right be entitled to demand any of it. The plaintiffs were denied relief under the circumstances because, as said by the court, "the member who died left no right to his representatives. It needs no argument to show that if such members had no rights they could transmit none to the petitioners in this case."

It is true that in both of the cases from the Supreme Court to which we have referred there had been no dissolution of the society, but it was determined in the first case that there existed a *consideration* in favor of or to the member who dedicated his property, and that it was not purely a voluntary act on his part; and in the second case that the agreement was sufficient to take all of the title to the property out of the dedicator, leaving nothing for his heirs to inherit. The consideration that is necessary to defeat the resulting trust need not be what in law is termed an adequate one, since many of the courts and text-books hold that where there is an expressed consideration it will be conclusively presumed to defeat a resulting trust in favor of the grantor. But we need not go that far in the decision of this case. In the Carroll County Academy case, *supra,* this court rec-

ognized that anything which was a valuable considera-
tion so as to defeat the trust would be a "presumptively
commensurable consideration." See also McElroy v.
Pope, *supra;* and Rawson v. School District, 83 Am. Dec.
670.

It is insisted by counsel for appellants that the opin-
ion in the case of Gass & Bonta v. Wilhite, *supra,* deter-
mined this question of consideration against appellees'
contention, i. e., that the maintenance, support, &c., dur-
ing life did not furnish a valuable consideration to the
donating member. It is true that some expressions are
used in that opinion which would indicate that the ma-
jority of the court rendering the opinion entertained
such views, but it must be remembered that it was not
necessary to the determination of that case that the ques-
tion should be decided, since it was held, as we have seen
in a former part of this opinion, that the covenant of
1814 bound its members not to disturb the property in
any way in the possession of the society, at least as long
as the society remained active and going and in the dis-
charge of the purposes for which it was organized; that
it was going at the time, and therefore the plaintiffs in
that suit had no right to withdraw their property which
they had donated when they became members, they hav-
ing signed the first covenant evidencing the Articles of
Agreement. Moreover, since the rendition of that opin-
ion the amended articles of 1844 have been executed, in
which the social and communistic features of the society
are more pronounced and its temporal affairs and rights
of the members more sharply defined, and even if the
language of that opinion be regarded as sufficient to in-
dicate the court's view that no consideration existed
for the donation of the property, we would be disin-
clined to follow it, in view of our interpretation of the
original covenant of 1814 as amended by the one entered
into subsequent to that opinion in 1844, and in the light
of the authorities, *supra,* upon that point. It therefore
follows that no resulting trust arose in behalf of appel-
lants entitling them to maintain this suit.

It is insisted by counsel for appellees that appellants'
pleadings fail to show any right in them to recover (1)
because it is not shown that any of the property which
their ancestor donated, or any into which it has been in-
vested, now exists. (2) They do not show that their an-
cestor, John Shain, died intestate or that any of the

intervening generations between him and them in a direct descending line died intestate, and that they therefore fail to show a right to recover, even though a resulting trust arose in favor of the heirs of John Shain, and (3) that the relief prayed for by appellants should not be granted, because of its being impossible to do so, i. e., that it would be impossible to obtain the evidence in view of the absence of records as to who had become members during the existence of the society, or how much they contributed, either in property or services, and who are the heirs of the members, and many other difficulties rendering such an accounting impossible. But because of the conclusions which we have reached we have not found it necessary to discuss or determine any of these questions. For the same reasons we have assumed that there has been such an abandonment by the surviving members of the society, or such a dissolution as would authorize a distribution of the property.

At this point, however, the question is asked—to whom does the property go? But because of the burdened condition of this court we feel justified in asking counsel to "let this cup pass," for "sufficient unto the day is the evil thereof." As said in the case of Wilson v. Leary, 120 N. C. 90, 38 L. R. A. 240; 58 Amer. St. R. 778, referred to and quoted from in the Neptune Fire Company case, *supra*: "When the lodge ceased to exist for want of members, whether its property passed to the Grand Lodge of the I. O. O. F. in this state, of which Oriental Lodge No. 24 was a member, or escheated to the state for the University (Code, sec. 26-27) *does not concern the plaintiffs* and is not before us."

So may we say that whether the property escheated to the state, goes to the survivors, or to the parent society, or elsewhere are questions that do not now concern us, and if we were to attempt to determine them it would not be binding as to any future litigant who is a stranger to this record. Having determined the only question presented by this appeal, we will refrain from entering unnecessarily into a discussion of that phase of the case.

Wherefore, the whole court sitting, the judgment is affirmed.