## Board of Parent Ministry, et al. v. Bohon, Ex'tx., et al.

(Decided May 13, 1921.)

### Appeal from Mercer Circuit Court.

1. Religious Societies—Conveyance of Property—Colony of Shakers. —Where it is shown by the covenants and constitution of a colony of Shakers that it is independent of all other colonies or branches of the society, recognizing the superiority of the parent or mother church in spiritual matters only, and where during a long period of years the local branch has bought and sold property without the consent or objection on the part of the parent society, and in the deeds to the local colony it only is named as grantee, and where owing to the age and infirmities of the members of the society their property has been allowed to deteriorate, and they have found it necessary from time to time to dispose of a large part of their holdings for their maintenance, said society has the right to convey its remaining property to a non-member to whom the society is indebted, in consideration of the agreement on the part of said grantee to deposit a stated sum of money for their current needs and to provide support and maintenance for the members of the society during their lifetime, and to give them a suitable burial.

2. Religious Societies—Colony of Shakers—Property.—Mere recognition by a local colony of Shakers of the authority of a parent society in matters spiritual does not give the parent or mother society any right, interest, claim or title in or to the property belonging to the local branch.

3. Religious Societies—Colony of Shakers—Property—Estoppel.— The parent church of the United Society of Believers called Shakers, held estopped to assert an interest in or title to property conveyed by a local branch or colony of Shakers where the home society by an act of the first in order of its ministry has approved of a conveyance by the local colony to a third person of all its property in consideration of the agreement of the grantee to provide for the welfare and maintenance of the remaining members of the local society and where the home society has fur-

thermore executed a quit-claim deed to the grantee in said conveyance.

CHARLES CARROLL, R. T. CROWE, R. L. BLACK, CHARLES T. CORN, JOHN P. PARKER and J. F. VANARSDALL for appellants.

HELM BRUCE, BRUCE & BULLITT, C. E. RANKIN and E. H. GAITHER for appellees.

OPINION OF THE COURT BY JUDGE QUIN—Affirming.

The United Society of Believers, commonly known as Shakers, had its origin in France prior to 1706. Their fundamental doctrine was that the second coming of Christ was near. A small society was organized in England in 1747. Because of her persecution, Ann Lee (to whom, according to their belief, Christ had revealed himself) came to this country in 1774. As a result of Ann Lee's work, a colony was organized at Mt. Lebanon, New York, in 1787. This became the parent church and from it branches were established in many states. Headquarters for the western country were opened in Union Village, Ohio, in 1805. The society in Kentucky had its beginning in Mercer county in August, 1805, at a place appropriately named Pleasant Hill. Here the society greatly prospered, reaching the zenith of its glory, power and affluence at a date prior to 1896. There were 450 members in the society at one time and it had title to 6,000 or 7,000 acres of property, including some of the best land in the county.

The history of Pleasant Hill, the activities and achievements of its people, their profound faith in God and their quaint customs make a most interesting story. Because of their emotional nature and the fact that in their religious service they were often exercised with great agitations of body and limbs, shaking, running and walking the floor, with a variety of signs and motions, they received the appellation of Shakers.

The members practiced communism and in order to enter the sacred privileges of the church relation, they were required to first settle all just claims of creditors and filial heirs and then followed a dedication and consecration of their persons, services and property to the pious and benevolent purpose of the gospel. Celibacy is a cardinal principle of their belief. Accessions, including children, were necessarily sought and obtained from the outside. Married persons could become members, but they ceased to live together upon joining the society.

The great prosperity of the colony was not destined for a long life; adversity came, new members ceased to be taken in, former members were growing older and the infirmities of old age incapacitated many of them from rendering any effective service.

An affirmance by the United States Circuit Court of Appeals of a judgment against the society on a note executed by one of the trustees necessitated the execution of a mortgage of their property to the Kentucky Title Company of Louisville for $30,000. This was in January, 1896, at which time the society had disposed of nearly one-half of its property; the mortgage embraced 3,334 acres. To lift this mortgage considerable of the land had to be sold. Despite frequent sales of land to pay accruing debts, the property was allowed to deteriorate; the fences were practically gone, the houses and barns were in bad state of repair, and the land, to use the expression of one witness, "had been cultivated down to the clay." Truly pathetic was the situation that confronted those good people and gloomy the outlook when, in September, 1910, the remaining covenant members of the society, eleven (11) in number, held a meeting looking to their future welfare. Fully cognizant of their deplorable condition and that it was imperative some action be taken to provide for their support, a committee of three was appointed with authority to enter into such contracts as would guarantee to them proper support and comfort during the remainder of their lives. This authorization included the right to encumber or convey the property.

Carrying out the suggestion of this meeting the committee, with the assistance of counsel, decided the best plan would be to convey the property to some one willing and able to provide for them. Mr. George Bohon, a non-member of the society and a leading citizen and banker of Harrodsburg, was prevailed upon to accept the trust. The property, consisting of 1,400 acres, was conveyed to Bohon. He took possession of it and undertook the care of the members of the society who continued to live on the property. Between the date of the conveyance and October, 1912, Bohon expended a net sum of $20,371.08 on the property. The transfer of the property resulted in protracted litigation, this being the third suit that has found its way to this court.

Under Ky. Stats., sec. 323, the county superintendent of schools of Mercer county, filed a petition alleging the society had been dissolved and therefore the Shaker

property had escheated to the Commonwealth. But a judgment dismissing the petition was affirmed on appeal. Adams v. Bohon, Extx., 176 Ky. 66, 195 S. W. 156, wherein it was held that the statute under which it was sought to escheat property expressly exempted the society from its operations.

In Easum v. Bohon, Extx., 180 Ky. 451, 202 S. W. 901, L. R. A. 1918D, 144, it was alleged the society was a purely charitable institution whose purposes and objects had failed and that the conveyance to Bohon had effected its dissolution, hence it was sought to have an accounting and distribution of the property to the members living at the time of the dissolution, and to the descendants of the deceased members. The petition in this suit was likewise dismissed.

The present suit was instituted by the Board of Parent Ministry of the United Society of Believers, and others, to set aside the deed to Bohon on the ground that it was obtained by fraud and without authority. A like order was asked in regard to a deed from Bohon to Pennebaker, executed in 1913, and of a quit claim deed from appellants to Bohon in 1912. It was alleged the deed to Bohon effected a dissolution of the society and therefore the Shaker property reverted to appellants for the benefit of the various Shaker societies in the United States. Upon final hearing this petition was dismissed and this appeal followed.

It is urged that under the covenants of the society, property is not held for any individual nor owned by any branch of the society but is a consecrated whole devoted to the society as a whole and upon the dissolution of any branch or colony all property held by it reverts to the parent ministry.

Aside from a recognition of the Mt. Lebanon, New York society as the mother church, an occasional reference to it in the records kept by the three colonies, to-wit: Pleasant Hill, Mt. Lebanon and Union Village, and the evidence of certain reports made to the parent society, we find nothing to indicate that appellant society has any right, title, interest or claim in or to any of the property owned by the Mercer county Shakers. Beginning as far back as 1821, in the conveyances of all property purchased, the grantee is designated as the society at Pleasant Hill, in Mercer county, nor do the deeds contain any reference to or intimation of any interest on the part of any one else.

Recognition of the parent church at Mt. Lebanon and of the central church at Union Village, in no wise deprived the Pleasant Hill society of the right to acquire, own or dispose of property in its own right.  The authority and leadership of these two societies seem to have been recognized and acknowledged solely in spiritual matters.  There is nothing to indicate any control or direction over the Pleasant Hill society in matters temporal. The Pleasant Hill colony bought and sold property without the consent or objection of the two senior societies.

In a circular epistle sent to all the societies from Mt. Lebanon in 1829 appears this significant statement:

"  .  .  .   and our mutual faith and love are the only bonds of union that have been found necessary, so far as regards our relation to God and each other as a separate and peculiar people."

And in the same document we find:

"  .  .  .  hence it becomes indispensably necessary that our temporal interest be secured in the hands of trustees.  .  .  . "

A very solemn ceremony usually attended the elevation of a member to the important office of trustee.  He was required to execute a declaration of trust in conformity to the provisions of "the covenant and constitution of the United Society of Believers, commonly called Shakers, at Pleasant Hill, in the county of Mercer, and state of Kentucky."

Of the three trustees at the time of the conveyance to Bohon, one (F. W. Pennebaker) was inducted into office in 1904.  He became a trustee of the church and society at Pleasant Hill."  As such he was to hold, manage and improve the temporal property of said church and society for its use and benefit and to buy, sell and transact business in behalf of same.  The investiture was of the legal title to all the property belonging to *said* church and society.  And so throughout the entire instrument the repeated use of the participial adjective "said" could refer to none other than the Pleasant Hill society.  Of this branch alone were they trustees.

The Mercer county society entered into a church covenant or constitution in 1814, but as their written agreements were not, like the laws of the Medes and Persians, unalterable, this covenant was changed from time to time. Others were executed in 1830 and 1844.  It is upon these covenants that much stress is placed by counsel for appellants to substantiate their claims in the present suit;

but, from a study of these documents, we are unable to agree with counsel as to their interpretation and construction thereof. This conclusion is exemplified in the preamble to the covenant or constitution of 1844, which reads:

"We the Brethren and Sisters of the United Society of Believers, (called Shakers), residing in the county of Mercer and state of Kentucky, being connected together as a religious and social community, distinguished by the name and title of *The Church of the United Society at Pleasant Hill,* which, for many years, has been established and in successful operation under the charge and protection of the Ministry and Eldership thereof; feeling the importance not only of renewing and confirming our spiritual Covenant with God and each other, but also of renewing and improving our social compact, and amending the written form thereof, *do make, ordain and declare the following articles* of agreement as a summary of the principles, rules and regulations established in the Church of said United Society *which are to be kept and maintained by us,* both in our collective and individual capacities, as a COVENANT or CONSTITUTION, which shall stand as a lawful testimony of our religious association before all men, and in all cases of question and law, relating to the possession and improvement of our united and consecrated interest, property and estate."

Acknowledgment of the ministry at Mt. Lebanon as the general center of union is found in article 1, section 2. But throughout the entire document this recognition of the ministry as before suggested seems to have reference only to the spiritual and primary authority of the society or community in all matters pertaining to the ministerial office. Visiting brethren from the mother church and from the society at Union Village, would oftentimes be present and preside over the meetings at Pleasant Hill. But nowhere do we find in the well and neatly kept records of the societies anything indicating that either the parent society or the one at Union Village had aught whatever to do with the property belonging to the Mercer county colony. It is admitted in appellants' brief that no question was raised by the parent ministry in regard to the disposition of property by the Pleasant Hill society until the conveyance to Bohon. This is explained by the fact that when those sales were made the society was a going concern and the sales and conveyances were

within the ordinary course of business and did not affect the integrity of the society as the proceeds of said sales were used for the benefit of the society as a whole. But, as we take it, the deed to Bohon was for no other purpose than for the protection and welfare of the society as a whole. The only instances giving any color to the recognition of appellants' claim of an interest of the parent church in the Pleasant Hill property are found in the mortgage to the Kentucky Title Company, and the later conveyance to Castleman, in which the title company joined. It is therein recited that the societies at Mt. Lebanon and Union Village gave their sanction and approval to these transactions; but this was manifestly for no other purpose than to satisfy the demands of the title company, which as a matter of precaution and protection on its part required this to be done. Other than the deed to Bohon the records of the parent ministry fail to show any other instance where notice was taken of any of the real estate transactions of the colony in Mercer county.

As we take it the relation of the local branches of the center of union and the parent society is strikingly similar to that of the Methodist church, which has its general, annual, district and church conferences, the first named being the final authority in matters pertaining to church government and discipline. Methodism is divided into a number of annual conferences, each of which is presided over by a bishop, elected by the general conference. These annual conferences in turn assign to the several churches the pastors for the succeeding conference year. While the annual, as well as the district, conferences may own property, such for example as an orphanage or a district parsonage, and while the authority of the bishop, presiding elders and superior conferences in all matters disciplinary and governmental is fully recognized and respected by the local churches, no authority other than the local church has any voice in the management, control or disposition of its church property, title to which under the law of the church is vested in trustees.

But if there was any doubt, (and we entertain none) about the conclusion we have reached to the effect that appellants have no claim or interest in the property at Pleasant Hill, this doubt would be dispelled by two events that took place subsequent to the execution of the conveyance to Bohon. First, in October 1912, pursuant to

a telegram from Joseph Holden, then the first in the order of the ministry of the mother church, Bohon met Holden at Cincinnati for a conference, and as a result of that conference there was endorsed upon the original deed from the trustees of the Pleasant Hill society to George Bohon this statement, to-wit:

"The foregoing contract and deed of sale between George Bohon and the society of Shakers at Pleasant Hill, Kentucky, is hereby ratified and confirmed this 18th of October, 1912. Joseph Holden, for central ministry of Mt. Lebanon, N. Y."

This visit was reported to the parent ministry. Apprised of the sale to Bohon the head of the parent church assented to and approved the conveyance. Certainly no one at the time entertained any idea of making claim to the property.

Second. Mindful of the fact that the Kentucky Title Company had required the parent ministry to give its consent to the execution of the mortgage to it, and with the evident purpose of trying to avoid any possible claim of title or interest in or to the property on the part of that society, such for example as is being made in the instant suit, Bohon in September, 1910, mailed to the parent ministry a quit-claim deed to the property conveyed to him by the Pleasant Hill society. This quit-claim deed was executed November 16, 1912, by Joseph Holden, Harriett Bullard and M. Catherine Allen for the ministry of the home society at Mt. Lebanon, and in it the first parties ratify and confirm said conveyance to Bohon and quit-claim any and all rights of the first parties to the property conveyed and upon the terms, conditions and stipulations contained in the said deed. Letters confirmatory of this transaction were later written by Holden to Bohon.

Thus it seems that not only in the endorsement on the deed itself and in the quit-claim deed, but in the letters last mentioned the parent society fully recognized it had no claim or interest in or title to said property, or if it did they were willing to and did endeavor to waive and convey any such claim or title in the Mercer county land. Furthermore it appears that when the Pleasant Hill colony was in financial straits they applied to the parent ministry for succor, but this was denied them, and they were told to manage their property to the best advantage under the circumstances. Before the conveyance to Bohon they again applied to the parent ministry

for help and it was again refused, though at this time the parent ministry suggested they would remove all the remaining members of the Mercer county society to other colonies, sell the property, pay the debts and give to the society any surplus that might remain, but this the local society was unwilling to do.   Pleasant Hill was their home, and like the Moabitess, Ruth, the exemplary daughter-in-law, they wanted to die and be buried in the land of their adoption.   The thought of a removal to other places was abhorrent to them.   It is testified that when these terms were submitted they became hysterical; they could not bear the thought of leaving Pleasant Hill.   As one of the two survivors expresses it, "all were too much Kentuckians to do that—to want to go anywhere."

It is rather significant, too, that when Elder Holden returned from his conference with Bohon at Cincinnati, and before the quit-claim deed was signed, he told his people that the place at Pleasant Hill was run down and very much out of repair; that the people were absolutely helpless and must be cared for.   He also reported a statement of Bohon that if he (Bohon) was reimbursed for what he had expended in repairs and in caring for the remaining Shakers and was paid the sum of $10,000, due him for money loaned the Pleasant Hill Shakers prior to the conveyance, he would be glad to convey the property to the parent ministry, if they would provide a caretaker for the remaining members and see that they had a respectable burial.   This offer was never accepted.

In March, 1913, Bohon and wife conveyed to W. F. Pennebaker, trustee for Sarah E. Pennebaker and three others, all of the grantees being members of the society, 576 acres of the land Bohon had received in 1910, upon the condition that Pennebaker would carry out the undertaking of Bohon's agreement as to the care and provisions of those named.

Bohon retained the remaining portion of the property and undertook the care of the remaining Shakers, of whom at the time the proof was taken there was but one, Sister Mary Settles; W. F. Pennebaker being the sole survivor of those he, Pennebaker, had agreed to care for. Sister Mary says the people have been very kind to her; that her board is furnished, likewise her clothing, and that she has a maid to take care of her.   This indicates that the agreement to   provide for the comfort and welfare of these unfortunate people has been fully and faithfully kept.

Gass, etc. v. Wilhite, etc. 2 Dana 170, was a proceeding instituted by two seceding members of the Pleasant Hill society for the purpose of obtaining a division of the property and having their shares allotted to them, and it was held that the import of article 3 of the covenant was that the property brought in by any members should become the property of the whole society as such, with a several right of use conferred on each member, as a member, and by consequence, only whilst or so long as he remained a member.  This statement is the basis of the argument in the present case that the trustees had no power to convey the property for the individual benefit of the members and that this was the effect of the conveyance to Bohon. But the Bohon deed was not different from the many other deeds that had been executed by the trustees to others.  Various tracts of land had been conveyed year after year for the sole purpose of paying the debts of the society and to provide a suitable maintenance for the members.  This was the express purpose of the Bohon deed. It is so recited in the deed itself. At the time this deed was executed the society was indebted to Bohon in the sum of $10,000.  Not only did Bohon agree to provide for the members as long as they lived, and also covenanted to see that they were given a suitable burial, but as a further consideration he set aside the sum of $5,000 to be used by them for such purposes as they might desire.  The conveyance to Bohon was as much a conveyance by the society for the society as any other conveyance made during the existence of the society at Pleasant Hill, and we can see no difference in effect between this deed and the others.  The proceeds of any conveyance by the society would necessarily inure to the benefit of the members of the society, and that is what happened when the property was conveyed to Bohon.  It was for the protection, care and welfare of the society or the individuals composing it—they were one and the same—and as such it was not contrary to the society's covenants or constitution.  The conveyance to Bohon was but another way of providing for the maintenance of the aged and practically helpless members.  Indeed a conveyance by piecemeal would have given no assurance the property would hold out to the end for the sustenance of the last survivor.  Under the deed to Bohon the grantors and members amply, wisely and prudently provided against that proverbial rainy day that they felt was

sure to come sooner or later.   There is no semblance of fraud in the obtainment of the Bohon deed.

On the whole case we are satisfied that appellants had no right, title, interest or claim in or to any of the property of the Pleasant Hill society.   Entertaining this view it necessarily follows the lower court did not err in ordering a dismissal of the petition.   The judgment is accordingly affirmed.